Obert E. BRADY, Appellee,

v.

ALLSTATE INSURANCE COMPANY, Appellant.

No. 81–2045.

United States Court of Appeals, Fourth Circuit.

Argued March 31, 1982.

Decided July 6, 1982.

---

Kalvin M. Grove, Chicago, Ill. (Jeffery A. Colby, Fox & Grove, Chartered, Chicago, Ill., on brief), for appellant.

Norman B. Smith, Greensboro, N. C. (Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N. C., on brief), for appellee.

Before HAYNSWORTH, Senior Circuit Judge, and HALL and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Allstate Insurance Company (Allstate) appeals a judgment entered after a jury verdict for the plaintiff, Obert E. Brady, in the amount of $33,431.00 on his claim that his discharge from employment was the result of "reverse discrimination" in violation of 42 U.S.C. § 1981. Finding insufficient evidence to support the jury's verdict, we reverse.

Brady was employed as an Allstate claims adjuster in Greensboro, North Carolina, until 1977, when he was discharged for violating a company policy which prohibited employees from engaging in outside employment in the auto repair business.

The evidence, viewed in the light most favorable to the appellee, *Millers Mutual Insurance Ass'n v. Southern Ry. Corp.*, 483 F.2d 1044 (4th Cir. 1973), was that for many years prior to Brady's discharge Allstate had a formal, written policy which barred claims employees from owning or maintaining a business interest in any business performing services commonly used in the adjustment of claims, such as auto garages and body shops.

At the time he was hired by Allstate in 1966, and continuously throughout his employment with Allstate, Brady operated an enterprise known as "Brady's Body Shop" in a building adjoining his house. Brady, who is white, held the shop license, owned the shop tow-truck, and represented himself as the sole owner on the shop's business cards and estimate forms. His tax returns indicated that he was the sole proprietor. Brady was frequently assisted at the shop by Joe Williamson, who also was employed as an Allstate claims adjuster; Williamson is black. Both men brought work into the shop. Also, Brady and Williamson often shared jobs and on those occasions split the profit from the work. Williamson had his own key to the shop and occasionally worked there even in Brady's absence. Brady and Williamson sometimes purchased wrecked vehicles, repaired them and sold them for a profit. The bulk of their work, however, was repairing damaged automobiles for private customers.

When Brady was hired as a claims adjuster he read and acknowledged Allstate's policy on outside employment, and he asked for and was granted permission to continue operating the shop so long as he did not repair automobiles involved in Allstate claims. The warning regarding repair of Allstate vehicles was repeated to him numerous times during his employment.

The incident leading to Brady's discharge occurred in 1976, when he agreed to repair and repaint an automobile belonging to the wife of David Coble, his neighbor. Brady and Coble also served together in the local volunteer fire department, and were well acquainted. Before Brady could begin the repair work, the automobile was involved in a collision with an Allstate insured motorist. Both Brady and Williamson were present, by chance, at Allstate's drive-in office when Coble arrived with his damaged vehicle to present his claim against the Allstate insured. Later, Coble asked Brady if he would do the repair work on the vehicle, including the work he previously had agreed to do. After being advised that the claim had been paid by Coble's wife's insurance carrier, and not by Allstate, Brady agreed to make the repairs. Williamson was present when Brady agreed to repair the automobile, but he did not participate in the conversation; both men performed the repair work and they split the profits.

In early 1977, Allstate learned that Brady had performed work on a vehicle involved in an Allstate claim. Brady was suspended with full pay and benefits, pending an investigation. Williamson was not suspended since at this time Allstate was unaware that he had any involvement in the incident. Following completion of the investigation by Allstate's regional office, James Britt, the regional office personnel manager, approved and forwarded to the zone office the recommendation of the claims department that Brady be dismissed.[1]

Fred Riley, the Southern Zone Employee Relations Manager, reviewed the recommendation and concluded that Brady should be reinstated since Allstate erroneously had permitted him to operate the body shop in violation of company rules. Neither Riley nor Britt was aware of the race of either Brady or Williamson. At Riley's direction, two regional supervisors met with Brady and were instructed to reinstate him if he would agree to comply in the future with the company's Claim Code of Ethics. Brady refused to acknowledge the Code of Ethics by signing a cover memorandum. Rather, he asked for and received additional time to consider the matter, stating that he needed the additional income generated by the body shop. Although the evidence is in dispute, Brady testified that he also asked for, but was denied, permission to amend the agreement to allow him to rebuild wrecked cars for his wife's use. When Brady subsequently refused to sign the cover memorandum, he was dismissed.

The two regional supervisors next met with Williamson and presented him with the same Code of Ethics, although the cover memorandum was differently worded. Williamson inquired as to whether he would be permitted to work on wrecked cars as a hobby and for his personal use, and was told that such activity was permitted provided it was not for profit. Williamson then endorsed the Code of Ethics as an indication of his intention to comply with them, but inscribed on the cover sheet "I agree with the above agreement but request that I be able to continue to purchase and build salvage on a personal basis, this would involve no customer work or competition among the body repair industry." Williamson then was allowed to maintain his position as a claims adjuster for Allstate.

The parties suggest at the outset that the *McDonnell Douglas*[2] standard usually applicable in disparate treatment cases is inapplicable in "reverse" discrimination actions, and that application of that standard in the case *sub judice* would be in some manner deleterious to their respective positions. *McDonnell Douglas*, of course, allows a minority plaintiff in a disparate treatment action to establish a *prima facie* case without direct evidence of discriminatory motive. "The McDonnell Douglas test is not an arbitrary lightening of the plaintiff's burden, but rather a procedural embodiment of the recognition that our nation has not yet freed itself from a legacy of hostile discrimination." *Parker v. Baltimore and Ohio Railroad*, 652 F.2d 1012 (D.C.Cir.1981).

It is true that some courts have determined that majority plaintiffs usually should not enjoy the advantage provided by the *McDonnell Douglas* standard, since "membership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated," *Parker, supra*, and we have no quarrel with the logic of that determination. However, it is unnecessary to decide that issue in this case since, even assuming that Brady was able to establish a *prima facie* case, it is clear that he was unable to meet the ultimate burden of persuasion on the issue of whether Allstate acted with discriminatory purpose.

1. Allstate's organizational structure is as follows: the Home Office is located in Northbrook, Illinois. The country is then divided into four Zones, including the Southern Zone located in Atlanta. Within each Zone there are a number of Regional offices, including one in Charlotte, North Carolina. Finally, the Regions are divided into District Offices, such as the Charlotte District Claim Office where Brady was assigned.

2. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Brady, following Allstate's presentation of its evidence of legitimate non-discriminatory reasons for his discharge, offered no additional evidence probative of his assertion that its advanced reasons were pretextual. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The appellee argues that although he produced no pretext evidence at that stage, the jury could properly have considered all the evidence introduced to that point, and could credit or discredit any of the testimony in determining whether or not Allstate's articulated reasons were a mere "cover-up" for a discriminatory purpose. Brady is correct in stating this general principle of law, but errs in his attempt to apply it to the facts of his case.

Allstate articulated specific and persuasive non-discriminatory business reasons why it treated Brady in one fashion and Williamson in another. Brady was the owner of the shop and all of the equipment; Williamson was merely a helper. Brady previously had been warned not to work on automobiles involved in Allstate claims; Williamson had not been warned. Brady negotiated directly with Coble; Williamson did not; Brady refused to sign the cover memorandum; Williamson signed it. The appellee essentially proved only that Allstate had an affirmative action policy, that one of the adjusters was black and one was white, that both were aware of the conflict of interest rule, that both performed part-time work for private profit, that both worked on Coble's car, and that Brady was discharged while Williamson was not. There was no evidence that Allstate was attempting to encourage blacks at the expense of white employees, that there were any overriding racial considerations either in hiring policies or in the conduct of everyday work at the district where the two adjusters were assigned, or that there were any biases involving race on the part of supervisors involved in the specific instance of Brady's discharge.

The test, in reviewing whether a trial judge should have either directed a verdict in defendant's favor or granted defendant's motion for judgment notwithstanding the verdict is whether, viewing the evidence in the light most favorable to the appellee-plaintiff, there is substantial evidence to support the verdict. *Millers Mutual Insurance Ass'n v. Southern Ry. Corp., supra.* In the case *sub judice*, there simply was not substantial evidence adduced at trial to support a finding that discrimination was a motive for Brady's dismissal. The district court should have directed a verdict for Allstate at the conclusion of all the evidence or granted Allstate's motion for judgment notwithstanding the verdict. The judgment of the district court is, therefore, reversed.

REVERSED.