Richmond

R.G. POPE CONSTRUCTON COMPANY, INC., et al. v. GUARD RAIL
OF ROANOKE, INC., et al.

June 9, 1978

Record No. 761655

Present: All the Justices.

James W. Elliott, Jr. (White, Elliott, Bundy & Jones, on brief), for plaintiffs in error.

Henry S. Stout, Jr. (Leslie M. Mullins; Mullins, Winston & Roberson, on brief), for defendants in error.

No brief for Fidelity and Deposit Company of Maryland.

COMPTON, J., delivered the opinion of the Court.

In this construction contract case, the dispute is between the general contractor on a highway project and the guardrail subcontractor. The controversy stems from the refusal of the subcontractor to perform its agreement.

In June of 1971, plaintiffs R. G. Pope Construction Company, Inc. and Pope Paving Corporation (hereinafter sometimes collectively referred to as Pope) executed a written contract with the Commonwealth of Virginia, Department of Highways (hereinafter, Highway Department) for the construction of a 6.5-mile section of U. S. Route 58 in Russell County between Dickensonville and Hansonville. During the following month, Pope and defendant Guard Rail of Roanoke, Inc. signed a written subcontract in the amount of $103,086.85 calling for the defendant to furnish and install steel guardrail in connection with the project. The prime contract expressly stated that all the work on the project was to be completed by October 1, 1973. The site was not ready for erection of all of the guardrail pursuant to the subcontract until July of 1974. As the result of Guard Rail's refusal to perform at that time, due to a shortage of steel and increases in steel prices, Pope engaged another subcontractor to do the work, which commenced in August of 1974 at a cost of $132,071.90 more than the original subcontract price.

Subsequently in February of 1975, Pope proceeded by motion for judgment against Guard Rail and its surety, Fidelity & Deposit Company of Maryland, seeking damages against Guard Rail in the foregoing amount, and against the surety in the amount of its bond, for Guard Rail's alleged breach of contract. Guard Rail thereafter

filed a counterclaim for $13,183.01 alleging lost profits as the result of an alleged breach of the subcontract by Pope.

After a jury trial lasting five and one-half days, the panel hung. The court below then discharged the jury and declared a mistrial. The respective parties thereafter renewed separate motions, earlier made during the course of the trial, to strike their adversary's evidence, Rule 1:11, and Pope also filed a motion for a new trial. The trial court, following consideration of additional memoranda of law and further argument of counsel, denied Pope's requests and granted the defendants' motions. Judgment was accordingly entered in favor of Guard Rail and the surety on Pope's original claim and in favor of Guard Rail against Pope in the amount sued for in the counterclaim. We granted Pope a writ of error to the August 1976 judgment order.

The documents comprising the agreement between Pope and the Highway Department included a proposal submitted by Pope in May of 1971, plans, and the Road and Bridge Specifications of the Highway Department contained in a 583-page manual. In the writings, Pope agreed to start work on the date specified in a Notice to Proceed and to complete all work in accordance with the plans and specifications "within the time limit set forth in the contract which is: October 1, 1973." The documents provided that "[t]ime is an essential element of the contract and it is important that the work be completed within the time specified." Under such a "fixed calendar date" contract, according to the agreement, the prime contractor must "take into consideration normal conditions considered unfavorable for the prosecution of the work and place sufficient men and equipment on the project to complete the work in accordance with the time limit." The contract also provided that extensions of time may be granted by the Highway Department "when a delay occurs due to unforeseen causes beyond the control of and without the fault or negligence of the Contractor." Under the agreement, if the work was not completed within the time limits, the Highway Department had the option of either permitting the prime contractor to continue with the work, assessing liquidated damages for each day of additional time consumed, or, take the prosecution of the work out of the contractor's hands, declaring him in default, and calling upon his surety for the satisfactory and expeditious completion of all work under the prime contract.

The subcontract was embodied in a printed form provided by Pope to Guard Rail. The subcontractor agreed "to furnish all labor, materials, equipment, and services as may be necessary to complete items of work on [the] project" relating to installation of the guardrail. In addition, Guard Rail acknowledged that it had "examined all the project plans, specifications, and other prime contract documents" and agreed to "assume and fulfill" all of Pope's obligations included in the prime contract, insofar as they applied to erection of guardrail. The subcontract further provided that Guard Rail would "prosecute the various portions of [its] work as directed by [Pope's] superintendent in order to assure orderly completion of the whole project within the contract time limit." The subcontract also required Guard Rail to "protect and maintain" its work until final acceptance by the Highway Department "or longer if so required by job specifications."

In a written "certification" executed on behalf of Guard Rail in September of 1971, the subcontractor acknowledged that "all stipulations of the 'Required Contract Provisions' of the Prime Contract" had been "physically incorporated" into the subcontract.

According to the evidence, one of the last items of work to be performed on a highway project is the installation of guardrail. This is because installation must occur in a continuous sequence, not piecemeal, after the highway shoulders and surface are completed. Unless such construction is at this final stage, serious problems of placement and alignment of the guardrail arise. The components of the device include a post, which is set in the ground; a block, attached to the post; and the rail, affixed to the block.

The record shows that the Highway Department notified Pope to proceed with construction on June 28, 1971. In the spring of 1973, Guard Rail entered into a contract with Syro Steel Company of Girard, Ohio, for Syro to furnish the guardrail components to enable defendant to perform the Pope subcontract. The testimony showed that Syro was not a steel manufacturer, but a fabricator and supplier which maintained an inventory of raw materials. The fabrication is accomplished about four weeks prior to the time the customer needs the product; the material is then placed on a truck when the customer calls for it and shipped directly to the job site to arrive at a time just before the rails are to be erected. In this

instance, Syro, which had examined the relevant prime contract documents, calculated that Guard Rail would need its product in August of 1973. According to the record, installation of guardrail in this quantity takes about four to six weeks.

Knowing that the prime contract called for completion of the project by the fixed calendar date of October 1, 1973, Syro's quotation to Guard Rail was based on a "locked in" price, provided delivery took place anytime from August of 1973 to "early November" of that year. Syro's representative testified that if Guard Rail did not call for the material within that time period, a new contract at different prices would have to be negotiated between the supplier and the defendant.

The evidence shows that by September of 1972, Pope was delinquent in the amount of work completed on the project to a degree which was unacceptable to the Highway Department. Nevertheless, Pope indicated in its Monthly Progress Schedules, and other correspondence filed with the Department, that its work would be completed on schedule. Progress continued to slacken and, because of the delinquency, the Highway Department temporarily disqualified Pope in June of 1973 from bidding on future contracts with the Department. The rate of progress failed to improve. In August of 1973, Pope advised its surety, its bonding agency, its banker, and the Highway Department of Pope's "difficulty" in completing the job and stated that it needed "additional resources to bring [the project] to a rapid conclusion." Guard Rail, however, was not advised by Pope of its "problems." In September of 1973, the Highway Commissioner notified Pope that because progress on the project was "very unsatisfactory", the Department would annul the contract and turn the work over to Pope's surety company unless within ten days Pope took such steps as would "insure the completion of the work within a reasonable length of time." Thereafter, with the assistance of Pope's surety, a superintendent was put on the job and progress improved. The contract was not annulled and Pope was allowed to continue with the project.

In April of 1974, having received no direct communication from Pope about the project or any order from Pope to proceed with the performance of the subcontract (except an October 1972 directive to install 1100 feet of temporary railing), Guard Rail wrote Pope

stating that the price it had quoted for the material had been "locked down" with the steel mill only until October of 1973 and declared that "[w]ith the steel situation the way it is," the subcontract "for this project must be renegotiated." The evidence showed that beginning in January of 1974, because of unanticipated economic conditions affecting the domestic steel industry, guard - rail posts became "non-existent." Syro's representative described the situation, which lasted to July of 1974, as "probably the worst shortage that the steel mills had ever placed upon fabricators." During that period, because of the short supply and great demand, prices for the guardrail components doubled and tripled.

Within two weeks after receiving the letter from Guard Rail, Pope wrote to the defendant that "the installation of this guard rail will begin during the month of May, 1974" and that "we will hereby expect you to fulfill the terms of your subcontract." Guard Rail refused to perform. Pope obtained another subcontractor to install the rails. The site was not ready for installation of all the rail until July of 1974 and the new subcontractor commenced work during August. The entire project was eventually completed by Pope in September of 1974.

Subsequently, the Highway Department, as a part of the process of ascertaining the amount Pope would be penalized for the overrun, allowed a 35-day extension on the contract time limit. It then assessed Pope with liquidated damages of $79,800 ($300 per day from November 5, 1973 until the project was completed).

Plaintiffs contend that the trial court erred in failing to sustain their motions to strike the defendants' evidence, or, in the alternative, that the court erred in refusing to award them a new trial. Plaintiffs argue, first, that Guard Rail breached its agreement by abandoning the subcontract prior to termination of the prime contract, without an excuse for non-performance. Plaintiffs say that the subcontract should not have been abandoned when it became more expensive to perform because economic hardship does not "form the basis of an excuse for non-performance."

Pope argues that Guard Rail could have avoided the situation which developed in January of 1974 by notifying Pope that its steel price was confirmed only until a specific date and by also notifying plaintiffs that it would refuse to perform after such date. Pope also

argues that Guard Rail could have made an attempt to extend its contract with Syro, which it failed to do.

In addition, Pope emphasizes that the prime contract allowed material to be stockpiled on the project site and provided for reimbursement of its cost, less a standard ten percent retainage. Plaintiffs say that Guard Rail was under a positive duty to cooperate with the general contractor in the performance of the prime contract and thus should have ordered the steel in advance and stored it on the site until ready for use.

Pope further asserts that time was not of the essence of the subcontract and that "the subcontractor was continuously obligated under the express terms of its agreement to perform the general contractor's prime contract obligations as long as the prime contract remained viable and executory." Pope points out that the Highway Department extended the completion date to November 5, 1973, and continued to regard the general contractor's obligations under the prime contract as unaltered until September, 1974. Plaintiffs say: "Clearly the whole and cumulative effect of the quoted agreements of the parties was that [Guard Rail] was to assume and fulfill Pope's obligation for guardrail installation under the prime contract in the time and manner directed by Pope, and to direct and maintain said work until accepted by the [Highway Department] or longer if required by the job specifications."

In its alternative argument seeking a new trial, Pope says that even if Guard Rail was not obligated to perform its agreement until the ultimate termination of the prime contract, it still did not possess the "right to abandon at the expiration of the prime contract's original completion date, but was obligated to perform within a reasonable time." Pope argues that the determination of what was a reasonable time and whether the general contractor called for performance by the subcontractor within that time was purely a question of fact for the jury, and was not a matter of law for the court.

Finally, Pope contends that even if the time of performance is presumed to be a reasonable time, Guard Rail wrongfully abandoned the contract because timely notice of the intention to abandon was never given to Pope by the defendant. Pope asserts that "it does not follow that one party may suddenly without notice

terminate the contract while the other party is in good faith attempting to perform it."

We are concerned here, of course, with contract performance.* Specifically, we are dealing with performances by each party to be exchanged under reciprocal promises. Guard Rail promised to do the work and Pope promised to pay the subcontract price. These bilateral promises implicated duties of performance by Pope as well as Guard Rail.

We hold that under these facts there was a material failure of performance by Pope which operated to discharge Guard Rail's duty to itself perform. Here, the defendant's performance of the duty to install guardrail was subject to certain conditions, the most important of which was the implied condition that a site would be available for such installation. The performance of Guard Rail's duty, subject to such conditions, did not become due unless the conditions occurred, or unless their nonoccurrence was excused. *Restatement (Second) of Contracts* § 251 (Tent. Drafts Nos. 1-7, 1973). *See Quintin Vespa Co.* v. *Construction Service Company,* 343 Mass. 547, 179 N.E.2d 895 (1962); *Restatement of Contracts* §§ 269, 295, 312, 315 (1932); 4 Corbin on Contracts § 947 (1951). *See also Restatement (Second) of Contracts* § 262 (Tent. Draft No. 8, 1973). In this case such conditions, culminating in the requirement for availability of a site upon which to erect the guardrail, did not occur at a time when Guard Rail was able to perform nor was such nonoccurrence of the conditions excused, as we shall demonstrate. In fact, Pope actually unjustifiably prevented Guard Rail from performing its contract by conduct which caused the delay in completion of the project, rendering Pope liable to Guard Rail for damages. *See Boggs* v. *Duncan,* 202 Va. 877, 882, 121 S.E.2d 359, 363 (1961).

As the defendants contend, among the conditions precedent to Guard Rail's obligation to perform was the express duty upon Pope, according to the prime contract incorporated into the subcontract, to conduct the work "in such a manner and with

---

*In the view we take of the case it becomes unnecessary to decide whether, as Guard Rail argues, time was of the essence of the subcontract, or whether, as Pope argues, time was not of the essence and the defendant was obligated to perform either within a reasonable time or even until termination of the prime contract.

sufficient materials, equipment and labor as are necessary to insure its completion in accordance with the plans and specifications within the time limit set forth in the contract." This gave rise to the implied duty upon Pope to do everything which was reasonably necessary to enable Guard Rail to perform within the time agreed. These general requirements gave rise to a significant implied duty upon Pope to provide a work site upon which Guard Rail could perform its promises according to the terms of the subcontract.

The evidence is without conflict that these conditions did not occur; the site was not ready for timely erection of the rail by October 1, 1973, the original contract completion date; it was not ready by November 5, 1973, the later-extended date; and it was not ready by May of 1974, the time when Pope called upon defendant to perform. There was no place ready to erect the guardrail until July 1974, according to all the evidence.

The main issue in the case then becomes: Was the nonoccurrence of these conditions excused? We think not. Ronald G. Pope, President of one plaintiff corporation and secretary-treasurer of the other, sought to excuse the delay by conclusory testimony unsupported by specific evidence. He testified that the delay was caused by "a considerable amount of bad weather, in excess of what we had in previous years"; by "unsuitable materials"; by "a lot of traffic" through the area which required time and manpower to control; and by "cement and fuel shortages". There was also evidence that Pope claimed that "economic difficulties due to . . . increased prices" contributed to the delay.

But not only were these reasons unsupported by sufficient evidence at the trial, these excuses were all rejected by the Highway Department when it assessed, after the project was completed, the ultimate responsibility which Pope had under the prime contract.

The contract provided (emphasis added) that if the Highway Department "determines that the work was delayed because of conditions *beyond the control of and without the fault of the Contractor*, [it] may extend the time for completion as the conditions justify." The Department's Resident Engineer, whose duties included direct supervision of the construction of this project, testified, reciting specifics, that he could find no basis for recom-

mending to the Department that even a one-day extension be granted to Pope. For example, he said that the amount of inclement weather did not justify any time extensions; that the percentage of "unsuitable material" was "relatively insignificant"; that Pope had admitted to the Department that "the fuel shortage had not actually interfered with his progress"; and that Pope never asked the Department for an extension based on "economic difficulties due to the increased prices." The Resident Engineer stated that at least three factors caused the 11-month delay: (1) Pope's "failure to prosecute the work diligently in the first year"; (2) Pope's "failure to provide engineering personnel on the project"; and (3) Pope's failure to provide adequate "supervision" on the job.

The Highway Department's District Engineer, under whose general supervision the project fell, was called as a witness by the plaintiffs. While stating that he "imagine[d] that fifty percent of the [highway] projects overrun in time", he said that in this instance Pope caused almost the entire period of delay and that such delay was due to conditions over which Pope had control. He testified that of the 35-day extension ultimately granted, any period exceeding eight days was a pure "gift" to Pope. He explained that officials in the Department above the district level, for reasons of fairness, frequently grant time extensions in addition to the amount recommended in the field when resulting liquidated damages would exceed the added expense incurred by the Department as the result of the overrun. So, he said, "to look at the 35 days and to say that this was the additional time of extension that was justified, is not necessarily true."

The evidence further showed that though Pope was continually short on cash and was otherwise undercapitalized, it entered into four major highway construction projects between 1970 and 1972. Pope was committed to complete eighteen million dollars' worth of such projects in two states (Virginia and Tennessee) within about three years' time. In a June 1973 letter to the Highway Department, Pope admitted that it was a "victim of ambition." The record shows that Pope lacked sufficient manpower, equipment or funds to meet the binding progress schedules. Finally, in order to obtain necessary capital, Pope sold "a substantial portion" of its equipment in February of 1974 and sold its "crushing operation" and asphalt plant three months later.

In sum, we believe that the plaintiffs' evidence, as a matter of

law, utterly fails to show that any of the 266-day delay, which continued beyond the extended completion date of November 5, 1973 and for which the Highway Department assessed liquidated damages, was excusable. Thus, under these facts, and considering the early 1974 unavailability of steel and the concomitant significant price increase, Guard Rail was fully justified in April of 1974 in refusing to perform its subcontract because of Pope's uncured material failure to render its performance due at an earlier date. *Restatement (Second) of Contracts* § 262, *supra*.

In conclusion, we will comment upon plaintiffs' claim that Guard Rail should have stockpiled the material and their claims that, in effect, Guard Rail otherwise should have taken some positive action to extricate Pope from its difficulties either by notices to Pope or efforts to extend the Syro contract. These contentions are all without merit. As to the storing issue, the contract did not require stockpiling of guardrail; it merely permitted it, and then only upon written request of the prime contractor. There was no evidence that Pope sought permission from the Highway Department to stockpile the guardrail nor did Pope ever notify Guard Rail that it desired the rail stored on the site. Furthermore, Syro's representative testified that it had not been the custom of contractors or subcontractors on highway jobs such as the one under consideration to stockpile guardrail. He stated that when stored on the project site, the steel tends to deteriorate rapidly when packaged in bundles in that it oxidizes, causing "white rust" to develop. Such condition furnishes grounds for rejection of the material by highway inspectors.

Accordingly, the plaintiffs' breach of contract action must fail and, because Pope prevented Guard Rail's performance of the contract, defendant's counterclaim must succeed.

For the foregoing reasons, we are of opinion that the trial court was correct in its several rulings on the respective post-trial motions. Consequently, the judgment below will be

*Affirmed.*