819 F.2d 1279
 RICO Bus.Disp.Guide 6644
 ENTRE COMPUTER CENTERS, INC., a Delaware Corporation, Appellant,
v.
FMG OF KANSAS CITY, INC., a Missouri Corporation and Porter
B. Guttery, Defendants,
and
Gary J. Fox and David H. McMullen, Appellees.
FMG OF KANSAS CITY, INC.; FMG of Omaha, Inc.; Gary J. Fox
and David H. McMullen, Appellees,
v.
ENTRE COMPUTER CENTERS, INC., Appellant.
ENTRE COMPUTER CENTERS, INC., a Delaware Corporation, Appellee,
v.
FMG OF KANSAS CITY, INC., a Missouri Corporation; Gary J.
Fox and David H. McMullen, Appellants,
and
Porter B. Guttery, Defendant.
FMG OF KANSAS CITY, INC.; FMG of Omaha, Inc.; Gary J. Fox
and David H. McMullen, Appellants,
v.
ENTRE COMPUTER CENTERS, INC., Appellee.
 Nos. 86-3520(L), 86-3528.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 11, 1986.
Decided June 4, 1987.
Rehearing Denied Aug. 11, 1987.
 
 James L. Quarles, III, Boston, Mass. (William G. McElWain, Hale and Dorr, Boston, Mass., Michael J. Walter, on brief), for appellant.
 Edward A. McConwell, Overland Park, Kan., Clayton E. Dickey (Kenneth C. Bass, III, Great Falls, Va., Jeffrey J. Peck, Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellees.
 Before SPROUSE, Circuit Judge, HAYNSWORTH, Senior Circuit Judge, and MAXWELL, United States District Judge for the Northern District of West Virginia, sitting by designation.
 SPROUSE, Circuit Judge:
 
 
 1
 The action from which this appeal arises involved the business failures of two retail computer store franchises. The franchisees--Gary Fox and David McMullen--obtained franchises from Entre Computer Systems, Inc., for Entre stores in Kansas City, Missouri, and Omaha, Nebraska,[1] and operated them through their corporations, FMG of Kansas City and FMG of Omaha.[2] After both businesses failed, FMG brought this action against Entre alleging, inter alia, breach of contract, fraudulent misrepresentation, tortious interference and RICO[3] violations. The district court dismissed the RICO claim.[4] After trial, however, the jury awarded FMG $960,539 for breach of contract and $4,000,000 for fraudulent misrepresentation ($251,426 in compensatory damages and $3,748,574 in punitive damages).[5] Entre subsequently moved for a judgment notwithstanding the verdict or for a new trial on both the breach of contract and fraudulent misrepresentation claims. The district court denied its motions.
 
 
 2
 We agree with and affirm the district court's action in dismissing the RICO claim. We also agree with the district court's denial of Entre's motion for judgment notwithstanding the verdict or for a new trial on the breach of contract claim and affirm that portion of the judgment. We disagree, however, with its denial of Entre's motion for judgment notwithstanding the verdict on the fraudulent misrepresentation claim and reverse that portion of the judgment.
 
 I.
 
 3
 Entre is a Delaware corporation with its corporate headquarters in Vienna, Virginia. It franchises retail computer stores and the franchisees, in turn, sell small computers to individuals and businesses. In late fall 1983, David McMullen and Gary Fox approached Entre about the possibility of opening Entre franchises in Kansas City and other Midwestern cities. David McMullen was a certified public accountant and successful businessman in Kansas City. His partner, Gary Fox, previously had managed several computer stores in the Midwest for Computerland, a competitor of Entre.
 
 
 4
 On December 19, 1983, Fox and McMullen mailed their franchise application to Entre. On January 6, 1984, they visited Entre's headquarters in Virginia and discussed their plans, including multiple stores, with John Zsidsin, Entre's senior franchising officer. Zsidsin mailed McMullen a franchise agreement for a single franchise on January 12. McMullen, through his attorney, altered it to reflect the fact that McMullen would have the exclusive right to future Entre franchises in Kansas City. He mailed Entre the modified agreement and a check to cover the franchise fee of $40,000. Zsidsin promptly returned the franchise agreement and the check, informing McMullen that Entre did not permit modification of its franchise agreements. Consequently, on January 20 McMullen mailed another signed franchise agreement to Entre, one that left the standard contract language intact.[6] McMullen testified, however, that Entre (through Zsidsin) orally promised him the exclusive right to operate Entre franchises in Kansas City. FMG based its fraudulent misrepresentation contention on this and other alleged oral promises. On February 28, Fox, McMullen and Guttery signed a franchise agreement for a store in Omaha, Nebraska. In the spring of 1984, Fox and McMullen created FMG of Kansas City and FMG of Omaha for the purpose of owning and operating the two Entre franchises.
 
 
 5
 The Kansas City store opened in June 1984, the Omaha store in September 1984. In July 1984, however, McMullen learned that Entre had granted a Kansas City franchise to a third party, Larry Shouse. In September, FMG brought suit to enjoin Shouse from opening his store, but this action was voluntarily dismissed in November 1984 after Shouse lost his financing. No other Entre store was ever opened in Kansas City.
 
 
 6
 The Kansas City and Omaha franchises both closed on January 10, 1985, because of financial difficulties. The parties disagree, however, on the cause of the financial problems. FMG contends that its lawsuit (to enjoin Shouse's operation) forced Fox and McMullen to divert their attentions away from establishing the two franchises. It also contends that Entre overcharged it $36,000 for inventory and equipment; that Entre forced it to purchase obsolete equipment; that Entre refused to accept returns of unordered merchandise; that Entre unexpectedly cancelled certain product lines; and that FMG lost $200,000 in profits because of Entre's inability to supply adequate quantities of IBM products.
 
 
 7
 In contrast, Entre contends that mismanagement led to financial difficulties and the eventual closing of the stores. Fox was the manager at the Kansas City store. He was demoted, however, because of unsatisfactory performance. In addition, the initial sales manager was discharged due to poor performance. Moreover, the Kansas City store suffered because the building was not ready at the beginning of the lease and the parking facilities were inadequate. At the Omaha store, the initial sales manager turned the store into a center for religious activity and had to be removed. His replacement fared no better, however, and was removed for lack of "business maturity." Finally, advertising problems, both on a local and national level, added to the stores' difficulties.
 
 
 8
 After the two franchises closed, FMG filed suit against Entre in federal district court in Missouri. Entre previously had filed an action against Fox, McMullen and Guttery in federal district court in Virginia.[7] FMG's action was transferred to Virginia and consolidated for trial with Entre's action.
 
 II.
 Breach of Contract
 
 9
 In its complaint, FMG alleged eleven breaches of the franchise agreement.[8] The jury agreed that Entre breached the franchise agreement and awarded FMG $960,539. Entre contends that none of these allegations were supported by sufficient evidence at trial. Accordingly, Entre argues that the district court erred in denying its motion for judgment notwithstanding the verdict.
 
 
 10
 In reviewing a judgment based on a jury verdict, our task is to determine whether, when viewed in the light most favorable to the prevailing party, the record contains substantial evidence to support the jury's finding. Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1433 (4th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); Brady v. Allstate Insurance Co., 683 F.2d 86, 89 (4th Cir.), cert. denied, 459 U.S. 1038, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982). An affirmative answer to that inquiry requires that we affirm the judgment.
 
 
 11
 FMG first argues that substantial evidence supports its allegation that Entre breached the agreement by preventing FMG from performing its contractual obligations. Under Virginia law, a party breaches a contract by preventing the performance of the opposing party. See R.G. Pope Construction Co., Inc. v. Guard Rail of Roanoke, Inc., 219 Va. 111, 244 S.E.2d 774 (1978); Boggs v. Duncan, 202 Va. 877, 121 S.E.2d 359 (1961). According to FMG, Entre prevented it from performing its contractual duties by imposing unreasonable demands. FMG offered evidence, for example, that Entre required it to purchase obsolete or excessive inventory, that Entre forced it to contribute to local and national advertising, and that Entre requested that FMG's stores be of above-average size. Whether these demands were unreasonable, however, is not the issue because FMG cites no contractual obligation that Entre's demands prevented them from performing. Consequently, this is an inadequate basis upon which to justify a verdict based on a breach of contract.
 
 
 12
 FMG further argues, however, that the jury's verdict is supported by evidence demonstrating that Entre failed to perform specific duties imposed upon it by the franchise agreement.[9] Although these duties are described in general terms, McMullen and Fox offered specific testimonial examples of obligations and breaches.
 
 
 13
 Section III.A. of the agreement provides that Entre will assist the franchisee in selecting a store site. Fox testified that Entre refused to approve his primary sites for the Kansas City store, thus forcing him to settle for a secondary location. Moreover, although Entre eventually approved the ultimate location of the Kansas City store, it initially rejected the site and this forced FMG to delay the opening of the store. McMullen testified that Entre's stated reason for refusing the initial selections was the heavy competition in that area. McMullen also testified, however, that Entre's later market survey confirmed Fox's original opinion--that his initial choices were good ones.
 
 
 14
 Section III.B. states that Entre will provide a qualified representative to instruct the employees of its franchisees. Fox testified that the Entre representative who visited the stores provided no help, but only offered unrealistic suggestions and created internal problems when he spoke directly to store employees.
 
 
 15
 In addition to the express duties imposed on Entre by the franchise agreement, "every contract imposes upon each party a duty of good faith and fair dealing." Restatement (Second) of Contracts Sec. 205 (1981). FMG also presented evidence probative of its contention that Entre breached its implied obligation to act in good faith. Fox testified that Entre shipped greater quantities of merchandise than ordered, charged for the excess, and then refused to allow FMG to return the unordered portions of the shipment. He also testified that Entre suddenly discontinued some product lines with no advance notice. In addition, Fox and McMullen testified that Entre refused to allocate sufficient quantities of certain IBM models, thus causing FMG to lose sixty to seventy sales of a particular model of computer. Finally, McMullen testified about the advertising problems FMG encountered because of Entre. He testified that Entre did not allow FMG to engage in "price" advertising. Instead, Entre limited it to "institutional" advertising,[10] yet, in late 1984 Entre's representative admitted to shareholders of the Kansas City and Omaha stores that "institutional" advertising did not work in the Midwest. McMullen also testified that neither the Kansas City nor Omaha stores were listed as authorized IBM dealers in IBM advertising circulars and promotional materials, despite repeated requests to both IBM and Entre.
 
 
 16
 The jury, no doubt, faced a difficult chore in weighing this evidence and gauging whether, in its totality, it was sufficiently probative of a breach or breaches of the franchise agreement. Were we the jury, we might have difficulty concluding that Entre breached the agreement. That, of course, is not our task. Rather, it is to determine whether the record contains substantial evidence to support the jury's verdict, see Wilhelm, 773 F.2d at 1433, and, after viewing all the evidence in the light most favorable to FMG, we conclude that the record contains substantial evidence that Entre breached the franchise agreement. We, therefore, affirm that part of the judgment based on the jury's finding that Entre was liable to FMG in the amount of $960,539 for breaching the franchise agreement, and consequently affirm the district court's denial of Entre's motion for judgment notwithstanding the verdict.
 
 
 17
 Entre moved, in the alternative, for a new trial on this issue. The decision to grant or deny a new trial motion rests within the discretion of the district court, and its ruling "will not be disturbed absent a clear showing of abuse of discretion." Wilhelm, 773 F.2d at 1433. The district court denied Entre's request and Entre now contends that the court's ruling was in error. According to Entre, a new trial should be held because the district court failed to submit special interrogatories to the jury and failed (in instructing the jury) to relate the elements of breach of contract to the specific facts in this case. We find no merit to either contention and affirm the district court's denial of Entre's motion for a new trial.
 
 III.
 Fraud
 
 18
 The district court also denied Entre's motion for judgment notwithstanding the verdict on the fraud claim. Entre contends that the court erred because there was insufficient evidence to support the jury's verdict on this claim. We agree.
 
 
 19
 Virginia law governing an action for fraudulent misrepresentation follows the general American pattern. The plaintiff must prove: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Winn v. Aleda Construction Co., Inc., 227 Va. 304, 315 S.E.2d 193, 195 (1984). The plaintiff also has the burden of proving each element by clear, cogent and convincing evidence. Id.; Carter v. Carter, 223 Va. 505, 291 S.E.2d 218, 221 (1982). Moreover, when reviewing a verdict against a sufficiency of the evidence objection, the evidence advanced in support of the verdict must be greater when the burden is proof by clear and convincing evidence than when the burden is proof by a preponderance of the evidence. See Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).
 
 
 20
 In its complaint, FMG listed eleven misrepresentations allegedly made by Entre prior to the consummation of the franchise agreement.[11] On appeal, however, FMG only advances evidence to support three of these allegations: Entre's oral promise that Fox and McMullen would be the sole franchisees in the Kansas City and Omaha metropolitan areas; Entre's oral promise that it would supply Fox and McMullen with adequate inventory; and Entre's oral promise that it would sell merchandise to Fox and McMullen at one percent over Entre's acquisition costs. We conclude that none of this evidence was sufficient to support the jury's fraud verdict based on any of the three allegations.
 
 
 21
 FMG relied primarily on McMullen's testimony that Zsidsin orally represented to him that Kansas City and Omaha would be his exclusive territory. Zsidsin denied making such a promise. If this were simply a conflict between the testimony of adversaries over whether a false misrepresentation had been made, we of course would be bound by the jury's finding. Our inquiry, however, cannot be so simply resolved.
 
 
 22
 Assuming Zsidsin made such a representation, McMullen could not, under any interpretation of reasonableness, have relied on the representation. This simple logic is enforced by the Virginia law controlling the question of reliance on a fraudulent misrepresentation. A party to a contract, learning before its execution that a prior representation made to him is false, has no right to rely on the representation. Beckley v. Riverside Land Co., 3 Va. 283, 23 S.E. 778 (1895); accord, Call Carl, Inc. v. BP Oil Corp., 554 F.2d 623, 631 (4th Cir.), cert. denied, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977) (A person cannot "reasonably [rely] upon ... allegedly fraudulent statements made in the face of plainly contradictory contractual language."). The evidence overwhelmingly demonstrates that McMullen was aware that Entre would not grant him an exclusive franchise for Kansas City. The written agreement specifically disclaimed exclusivity for any franchisee.[12] When McMullen's attorney altered the franchise agreement to provide McMullen with an exclusive right to franchises in the Kansas City area, Zsidsin explicitly rejected the alteration. McMullen subsequently signed the standard franchise agreement that contained the nonexclusivity clause. If, indeed, Zsidsin made representations concerning exclusive franchising, McMullen now obviously was aware that such oral representations were false. Consequently, not only does the evidence fail to support a finding that McMullen was justified in relying on Zsidsin's statements, but it is singularly probative of a contrary conclusion.
 
 
 23
 FMG also presented evidence in support of its contentions that Entre fraudulently promised FMG that it would supply adequate inventory and supply that inventory at a set price (Entre's acquisition cost plus one percent). Allegations of fraud, of course, must be pleaded with particularity. Fed.R.Civ.P. 9(b). There is considerable doubt whether FMG's complaint satisfied this requirement in alleging these incidents of fraud. Assuming without deciding, however, that FMG properly pleaded its allegations that Entre made fraudulent misrepresentations concerning product pricing and product availability, the evidence introduced at trial was insufficient to justify the jury's verdict on either ground.
 
 
 24
 With respect to product availability, Entre denies making the promise as alleged. It concedes that it may have expressed an opinion that it could supply all of the franchisees' computer product needs, but insists that it could not, and did not, guarantee such supply and stresses that its opinion did not amount to a promise. At trial, Fox admitted that he expected some products to be backordered because his past experience taught him that the demand for certain IBM products often exceeded the supply. Moreover, he testified that even if a distributor of IBM products promised an unlimited supply of IBM merchandise, a franchisee would be "crazy" to believe such a representation. Likewise, McMullen admitted that Entre was not obligated to supply certain amounts of merchandise. He testified that his assumption that Entre had such an obligation was based on Entre's representations to him that the stores could expect to do a certain amount of business. Although we view this testimony in the light most favorable to FMG, it is insufficient to support a finding that Entre fraudulently induced FMG to enter into the franchise agreement by promising that it could guarantee sources of supply.
 
 
 25
 With respect to product pricing, FMG contends that Entre misrepresented the price at which Entre would sell merchandise to it. Fox and McMullen testified that Entre promised to sell them inventory at Entre's cost to acquire the product plus one percent.[13] Entre does not dispute that there were variations in the cost estimates that it communicated to its franchisees. Donald Yentzer, Entre's Director of Financial Services, testified that Entre's goal was to break even in distributing computer products to its franchisees. To achieve this goal, Entre normally charged franchisees from 0-5% over its acquisition cost on a particular product. The rate varied depending on how much (or how little) a particular item could be marked up and still be competitive with other computers of comparable quality. Yentzer testified that, to break even on all these transactions, Entre had to average selling products at its acquisition cost plus three percent. Entre argues, and we agree, that its statements to McMullen and Fox concerning charges to them were not substantially inconsistent with its normal practice, and its charges to FMG did not represent clear and convincing evidence that Entre induced the franchisees to enter into the franchise agreement by fraudulently misrepresenting this information to them.
 
 IV.
 RICO
 
 26
 In its complaint, FMG also alleged that Entre committed RICO violations. The district court dismissed this claim during trial. FMG has filed a cross-appeal on this issue. In dismissing the RICO claim, the district court relied on United States v. Computer Sciences Corp., 689 F.2d 1181 (4th Cir.1982) cert. denied, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). In Computer Sciences, we concluded that the term "enterprise,"[14] as used in 18 U.S.C. Sec. 1962, "was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designated to ... punish." Id. at 1190. (emphasis added). The district court ruled that since Entre was the "person," Entre could not be the enterprise, nor could Entre combine with its franchises to form the enterprise. Consequently, the court dismissed the RICO count, holding that FMG failed to establish the existence of an enterprise.
 
 
 27
 FMG argues that corporations have been held capable of forming an "association in fact," as that term is used in the definition of a RICO "enterprise." See United States v. Huber, 603 F.2d 387 (2d Cir.1979), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). It contends that since the district court found that "associations in fact" could refer only to individuals, and not corporations, its ruling was in error. We need not reach that issue. Assuming a corporation can be part of an "association in fact," the central question is whether it can combine with other entities to form an enterprise, when it is already the "person" whose behavior the Act is designed to punish. Computer Sciences answers that question in the negative. Next, FMG argues that all Entre franchisees were the "enterprise" and Entre was the "person" because all the franchisees had a corporate existence separate and apart from Entre. It also argues that the individual officers and directors of Entre were the "persons" who conducted the affairs of Entre, the "enterprise." Finally it argues that Entre was the "person" and the "enterprise" consisted of Entre and its officers and directors. We cannot agree with any of these contentions and agree with the district court that its ruling on the RICO question was governed by Computer Sciences.
 
 
 28
 In view of the above, we affirm the district court's refusal to grant Entre's motion for judgment notwithstanding the verdict or for a new trial on the breach of contract claim. We also affirm the district court's dismissal of FMG's RICO claim. But we reverse the district court's denial of Entre's motion for judgment notwithstanding the verdict on the fraud claim and remand with instructions to enter judgment in favor of Entre on that portion of the judgment.
 
 
 29
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 
 
 30
 HAYNSWORTH, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 31
 I concur in the majority opinion in so far as it reverses the judgment entered upon the verdicts on the tortious interference and fraudulent representation claims on the ground that there is no evidence to support those verdicts, and I also agree that there were some submissible breach of contract claims, but I would reverse the denial of a new trial on the breach of contract claims upon the ground that there is no evidentiary support for the damages assessed by the jury. Denial of the motion for a new trial upon those claims was an abuse of the discretion lodged in the district court.
 
 
 32
 Though, as the majority opinion demonstrates, there was no basis for any claim of fraud, wild accusations of fraud were brought before the jury. Demonstratively, the jury went completely awry for it brought in a verdict of $4,000,000 in compensatory and punitive damages on the fraudulent representation claim. Inflamed by the notion that the defendant's conduct was infected with fraud, the jury awarded $960,539 on the contract claim, but there is no relation of the award to any contract breach the jury might have found.
 
 
 33
 The claims of contract violations are relatively trivial, and the consequences easily quantifiable. There is no real basis for any dispute that the primary cause of the failure of the two stores was poor management by the plaintiffs.
 
 
 34
 The plaintiffs claim that Entre broke the contract when it initially questioned the plaintiffs choice of location for the store. Whether any contract breach was made out is surely questionable, since the plaintiffs had bargained for Entre's assistance in site selection, but any possible damages flowing from any such violation should have been subject to reasonable estimation.
 
 
 35
 The plaintiffs charge that Entre broke its promise to furnish a qualified representative for assistance in training because the person proved to be of no help. If that be so, damages suffered by the breach would be minimal.
 
 
 36
 The plaintiffs charge that Entre broke its implied obligation to act in good faith by shipping some obsolete merchandise and other merchandise in greater quantities than ordered and refusing to accept return of those unwanted goods. If that be so, the damages suffered should be readily identifiable.
 
 
 37
 The plaintiffs charge that Entre failed to supply its demand for a certain IBM computer. That model was in short supply, and one of the fraudulent representation claims was founded upon an alleged oral representation that Entre was in a position to meet the store's needs for such merchandise. With the fraud claim out, there was no failure of performance of any promise by Entre in failing to supply IBM computers it could not obtain.
 
 
 38
 The plaintiffs complain that Entre required that advertising by the two stores be institutional and not price oriented.
 
 
 39
 Finally, the plaintiffs claim that the two stores were never listed as authorized IBM dealers in IBM circulars and promotional materials. If failure of these two stores to appear in IBM's listings of its authorized dealers during the few months these stores were in existence was a breach of some duty assumed by Entre, the consequence was comparatively small. There is no claim that the plaintiffs, in their own advertising and promotional materials, could not have held themselves out or did not hold themselves out as authorized IBM dealers.
 
 
 40
 The court refused to charge the jury, as requested by Entre, that damages could not be based upon speculation or conjecture but should be those reasonably determined to have been suffered because of the breach. We do not know in what respect the jury may have thought Entre failed to perform its promises, but if we assume that the jury found for the plaintiffs on all submissible claims, it is inconceivable that the damages could have aggregated anything approaching the amount of the jury award.
 
 
 41
 It appears to me that the jury, mistakenly convinced that the defendant had acted fraudulently, assessed the damages on the contract claims on the basis of passion and not of reason.
 
 
 42
 I think Entre is entitled to a new trial on the contract claims without the diversion of intemperately asserted fraud claims.
 
 
 
 [1]
 Porter Guttery was also a party to the Omaha franchise agreement
 
 
 [2]
 The plaintiffs in this action are FMG of Kansas City, Inc., FMG of Omaha, Inc., Gary Fox and David McMullen. They are hereafter collectively referred to as FMG
 
 
 [3]
 The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Secs. 1961-68
 
 
 [4]
 FMG has filed a cross-appeal from the district court's dismissal of this claim. See infra Part IV of this opinion
 
 
 [5]
 The jury also awarded FMG $3,000 on their tortious interference claim. The trial court, however, granted Entre's motion for judgment notwithstanding the verdict on that portion of the judgment and that decision has not been appealed. Other counts either were dismissed voluntarily by FMG or were not submitted to the jury
 
 
 [6]
 The franchise agreement provided:
 Franchisee expressly acknowledges and agrees that this franchise is non-exclusive except as it relates solely to the approved location described in Appendix A., hereof....
 
 
 [7]
 Entre sought a declaratory judgment that it had not granted Fox, McMullen and Guttery the exclusive right to operate Entre franchises in Kansas City
 
 
 [8]
 Failing to approve store sites in Kansas City which were advantageous to plaintiffs
 Failing to adequately advise plaintiffs concerning the store site on Westport Road.
 Failing to provide on-site opening assistance.
 Failing to provide adequate training and consultation for franchisee and its employees.
 Failure to provide adequate reports to plaintiffs' management concerning the adequacy of computer center operations.
 Failure to advertise and adequately promote Entre for the benefit of plaintiffs' Kansas City and Omaha computer centers.
 Failure to support products sold to plaintiffs.
 Overcharging plaintiffs for goods sold to plaintiffs.
 Failure to cause FMG, FMG of Kansas City and FMG of Omaha to be listed in the appropriate IBM directories.
 Preventing or interfering with plaintiffs' performance of the franchise agreements in Kansas City and Omaha.
 Wrongfully terminating the franchise agreements and failing to refund franchise fees in full per notice of termination.
 
 
 [9]
 Section III imposed the following obligations upon Entre:
 A. Franchisor shall make available site selection guidelines, standard plans, and specifications for interior layout, signs and fixtures; which Franchisee shall adapt, at Franchisee's expense, to the Center's location.
 B. Franchisor shall provide an initial training program for Franchisee, Franchisee's Manager, Technician, Trainer, and two (2) Salesmen and up to two (2) other designated employees as may be approved by Franchisor. In the event Franchisee requests additional instruction, Franchisor shall provide a qualified representative at such times and places as may be mutually convenient. Franchisor shall make available such other training programs or seminars as Franchisor deems appropriate. All training provided by Franchisor shall be subject to the terms and conditions set forth in Paragraph V.F. of this Agreement.
 C. At Franchisee's request, Franchisor shall provide on-site opening assistance and supervision for at least one (1) day at the opening of the Center; and for at least one (1) day during the second month of operation.
 D. In order to maintain the high standards of professionalism and service quality associated with the System, Franchisor shall provide such continuing consultation and advisory assistance, as Franchisor deems appropriate, in the operation of the Center.
 E. Franchisor shall provide on loan to Franchisee for the term of this Agreement one (1) copy of the Confidential Operating Manual, to be delivered at the commencement of training, as more fully described in Paragraph VII. hereof.
 F. Franchisor shall continue its efforts to maintain high standards of quality, appearance, professionalism, and service of the System, and to that end shall conduct, as it deems advisable, inspections of the business facilities operated hereunder, and evaluations of the services and products offered by Franchisee.
 G. Franchisor shall not, by virtue of any approvals, advice, or services provided to Franchisee, assume responsibility or liability to Franchisee or any third parties to which Franchisor would not otherwise be subject.
 H. Franchisor shall operate and administer an advertising fund in accordance with the provisions of Section IX.D. of this Agreement.
 
 
 [10]
 In price advertising, the advertiser attempts to appeal to the buyer by demonstrating that his product is less expensive than comparable products. In institutional advertising, the advertiser attempts to appeal to the buyer by stressing the name of the product or the name of the company that manufactures the product
 
 
 [11]
 That if plaintiffs would agree to become an Entre franchisee they would be the sole franchisee for the Kansas City and Omaha metropolitan areas
 That franchisees of the Entre system were substantially successful and that a gross profit from the sale of products of 35% could be reasonably expected.
 That Entre had studied the market for Entre franchises in the Kansas City and Omaha metropolitan areas and that the franchisees utilizing the Entre system in those markets would be successful and be of substantial value to the appointed franchisee.
 That products which were required to be purchased by Entre franchisees from Entre were sold only as an accommodation to franchisees so that franchisees would have such products available at the lowest possible price; further that Entre made no profit from the sale of such goods.
 That the initial investment and financial obligations of plaintiffs was to be $263,000 to $360,000 for each store.
 That Entre would assist plaintiffs in selecting the best possible store site in the Kansas City and Omaha metropolitan areas.
 That the layout of the Entre Computer Centers and the location of the center was vitally important to the success of an Entre Center.
 That media advertising was extremely important to the success of Entre centers and that plaintiffs would be required to expend substantial monies on media advertising.
 That Entre would charge plaintiffs a 1% advertising fee which would be used to benefit plaintiffs' franchise locations.
 Entre representatives would assist plaintiffs in establishing franchise locations and take whatever steps were necessary to assure that the stores were successful.
 That plaintiffs could reasonably expect their Entre computer centers to be profitable by the third month of operation.
 
 
 [12]
 See supra footnote 6
 
 
 [13]
 McMullen acknowledged, however, that he was aware that there were certain distribution costs associated with shipping the products to him
 
 
 [14]
 18 U.S.C. Sec. 1961(4) states:
 "enterprise" includes any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity. (emphasis added).