896 F.2d 1367
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
TYGER CONSTRUCTION COMPANY INCORPORATED; Fidelity and
Deposit Company of Maryland, Plaintiffs-Appellees,
v.
BEER PRECAST CONCRETE LIMITED, Defendant-Appellant,
v.
SKYLINE CRANE SERVICE, INC., Third Party Defendant.
TYGER CONSTRUCTION COMPANY INCORPORATED, Plaintiff-Appellant,
and
Fidelity and Deposit Company of Maryland, Plaintiff,
v.
BEER PRECAST CONCRETE LIMITED, Defendant-Appellee,
v.
SKYLINE CRANE SERVICE, INC., Third Party Defendant.
FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Plaintiff-Appellant,
and
Tyger Construction Company Incorporated, Plaintiff,
v.
BEER PRECAST CONCRETE LIMITED, Defendant-Appellee,
v.
SKYLINE CRANE SERVICE, INC., Third Party Defendant.
 Nos. 89-2934, 89-2935 and 89-2937.
 United States Court of Appeals, Fourth Circuit.
 Argued: Dec. 5, 1989.
Decided: Feb. 13, 1990.
 
 John S. Morris, III (Thomas F. Farrell, II, McGuire, Woods, Battle & Boothe, on brief), for appellant.
 Arthur Isaac Leaderman (Randall C. Allen, Smith, Pachter, McWhorter & D'Ambrosio, on brief), for appellees.
 Before DONALD RUSSELL and CHAPMAN, Circuit Judges, and JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation.
 CHAPMAN, Circuit Judge:
 
 
 1
 These appeals raise several issues regarding the construction and performance of a contract between Tyger Construction Company, Inc. ("Tyger") and Beer Precast Concrete Ltd. ("Beer"). In Beer's claim against Tyger (C.A. No. 88-175), the district court held that Tyger wrongfully terminated the contract and awarded Beer damages. In Tyger's claim against Beer (C.A. No. 88-48), the district court held that Beer was responsible for damages resulting from its delays in performing under the contract. However, the court found that the modification of the contract agreed to by both parties was not the result of economic duress. After oral argument and a careful review of the briefs and record, we find no error in the district court's rulings and affirm.
 
 
 2
 * In furtherance of its contract with the County of Fairfax, Virginia ("County") for the construction of the Fairfax Adult Detention Center ("Project"), Tyger entered into a subcontract with Beer on February 1, 1984, whereby Beer agreed to fabricate, deliver and erect precast concrete panels and interior cell furniture for the fixed amount of $788,400, which was to be paid in installments before delivery. The contract required work to commence within three weeks of notice given by Tyger. On July 23, 1985, Beer and Skyline Crane Service ("Skyline") negotiated a contract under which Skyline agreed to perform Beer's contractual obligations to erect the precast panels and cell furniture for Tyger.
 
 
 3
 Because of a series of delays and postponements in the precast concrete commencement, Beer sent a letter to Tyger on February 1, 1985, demanding $159,159 in addition to the contract price before it would ship or erect the precast panels. Tyger disputes that these delays produced additional costs, asserts that it already had paid for and thus had title in the goods held by Beer, and argues that Beer threatened this postponement solely to obtain the additional money. In a letter dated June 28, 1985, Tyger told Beer that these actions constituted economic duress, but Tyger did not try to find another precast fabricator or pick up the precast itself. Consequently, Tyger and Beer agreed to Change Order 3, which was dated July 12, 1985, and which granted Beer the full $159,159 it had demanded.
 
 
 4
 The parties stipulated that, on March 21, 1985, Tyger instructed Beer to begin work on June 3, 1985. Also in March 1985, Beer informed Tyger that the building was inadequately prepared for panel installation because the dimensions of the concrete were incorrect and there was reinforcing steel ("rebar") in the pockets of the shearwall where the panels were to be connected. Although Tyger acknowledged its responsibility for these problems and promised to rectify them, the building was still not available for Beer's work as of July 1985.
 
 
 5
 Nevertheless, Tyger ordered Beer to proceed with its work by August 8, 1985. Notwithstanding the problems with the site, Beer began erection of the panels on August 8, 1985. The concrete and rebar problems led Beer to bear demurrage costs and caused Beer's subcontractor, Skyline, to incur idle time and resulted in Skyline walking off the job on three occasions in August, September, and November of 1985.
 
 
 6
 Beer substantially completed its work under the contract on January 10, 1986. However, Tyger contends that the project was greatly delayed by Beer's stoppages, that several of the panels furnished and installed by Beer were cracked, chipped and misaligned, and that it wrote Beer on January 10, 1986, to finish the remaining work. On February 24, 1986, Beer notified the County, but not Tyger, that it was suspending its contract guaranty, meaning that it had repudiated its obligation to repair or replace defective or damaged panels. On March 17, 1986, Tyger again wrote Beer outlining certain work to be corrected and completed and demanding that Beer respond within ten days showing its commitment to complete the subcontract work; otherwise, Tyger would consider Beer in default. When Beer failed to respond, Tyger terminated the contract on March 31, 1986, and completed the work.
 
 
 7
 This litigation began on January 21, 1987, when Beer filed a motion for judgment in the Circuit Court of Fairfax County, Virginia, against Tyger and Tyger's surety, Fidelity & Deposit Company of Maryland ("F & D"), seeking $345,766.27 in an unpaid contract balance and other damages resulting from Tyger's termination of the contract. Subsequently, Tyger removed the action to the United States District Court for the Eastern District of Virginia. Beer later joined Skyline as third-party defendant; Skyline, however, is not a party to this appeal.
 
 
 8
 Tyger filed a complaint against Beer seeking damages of $1,259,398 for delays caused by Beer, recovery of the $159,159 paid under economic duress, and damages for conversion of the withheld goods. The district court consolidated the two cases on June 9, 1988. After dismissing Tyger's conversion claim on summary judgment, the district court made findings of fact and conclusions of law.
 
 
 9
 In Case No. 88-175, the court awarded judgment to Beer in the amount of $108,445.76 against Tyger and F & D, finding that Tyger wrongfully terminated Beer by unilaterally imposing a condition in its letter of March 17, 1986.
 
 
 10
 In Case No. 88-48, the court initially awarded Tyger damages totaling $244,949.46, later increased to $250,607.46 because of a computation error. The court found that Beer was obligated to commence performance on June 3, 1985, and was responsible for damages resulting from the 66-day delay between June 3 and August 8, 1985, when Beer actually started work. Also, the court found that the Change Order 3 was not the product of economic duress on the part of Beer, because there was no evidence that Tyger pursued any of the several alternatives open to it.
 
 II
 
 11
 * Beer contends the district court erred in concluding that Beer was "legally obligated to be ready to begin precast erection on June 3, 1985," because Tyger itself had materially breached the contract by failing to make the site available to Beer at that time, i.e., by failing to rectify the concrete and rebar problems. Beer relies on the district court's finding that Beer was entitled to terminate the contract on August 8, 1985, as a result of Tyger's breach, asserting that this breach existed on June 3, 1989, as well. Beer argues that since this material breach excused Beer's duty to perform on June 3, 1985, the district court erred in awarding Tyger delay damages for the period of June 3, 1985, to August 8, 1985.
 
 
 12
 Beer is correct insofar as it was legally entitled to terminate the contract because of Tyger's material breach. An implied condition of every contract is that one party will not hinder or prevent performance by the other party. Whitt v. Godwin, 205 Va. 797, 800, 139 S.E.2d 841, 844 (1965). In a construction contract, the general contractor has an implied duty to make the site available to the subcontractor, and the subcontractor's duty to perform does not arise unless this implied condition occurs or is excused. Pope Construction Company, Inc. v. Guard Rail, 219 Va. 111, 118, 244 S.E.2d 774, 778 (1978). Here, Tyger's failure to rectify the concrete and rebar problems constituted a material breach and excused Beer's performance.
 
 
 13
 However, Tyger's material breach did not automatically end the contract; instead, it merely gave Beer the option either to end the contract or to continue the contract on its original terms and sue for damages for partial breach. Cities Service Helex, Inc. v. United States, 543 F.2d 1306, 1313 (Ct.Cl.1976). In this case, Beer elected to continue the contract and waived its right to terminate the contract on June 3, 1985, by failing to exercise its right to cancel "with reasonable promptness after discovery of the breach" and by continuing otherwise to abide by the terms of the contract. Id. at 1315. As a result, Beer cannot now use this breach as justification for its own failure to begin work. Naveto v. Sletton, 560 F.2d 340, 356 n. 12 (8th Cir.1977). For these reasons, the district court did not err in holding Beer liable for damages resulting from its 66-day delay.
 
 B
 
 14
 Tyger appeals the district court's holding that Change Order 3 was not the product of economic duress. In arriving at this conclusion, the district court applied the following statement of the elements of common law duress:
 
 
 15
 Tyger must prove that Beer "committed an unlawful or wrongful act sufficient to preclude [Tyger] from exercising [its] free will and thereby rendering [Tyger's] consent ... involuntary," Freedlander, Inc. v. NCNB, [706 F.Supp. 1211, 1216 (E.D.Va.1988) ], and that Tyger itself " 'proceeded promptly upon the removal of the duress ... to repudiate the contract.' " Id. at [1217], quoting Gloth v. Gloth, [154 Va. 511, 552,] 153 S.E. , 892 (1930). In addition, " 'the presence of an adequate legal remedy undermines claims of economic duress. [']" Id. at [1219], quoting Ismert and Associates, Inc. v. New England Mutual Life Ins. Co., 801 F.2d 536, 549 (1st Cir.1986).
 
 
 16
 While Tyger does not challenge this formulation of the law, Tyger disputes several of the district court's factual findings, namely that Tyger had "several alternatives open to it short of signing Change Order 3" and that Tyger "made no attempt to repudiate [the change order] until it filed the present suit in January, 1988."
 
 
 17
 We believe that the district court did not clearly err in making these findings. First, even though each precast item was custom-made to the County's specific architectural requirements, Tyger concedes that it never even attempted to find another precast fabricator. Tyger's theoretical assertion that these efforts would have been futile is inadequate. Second, while Tyger protested the contract modification, admittedly it did not repudiate the contract as required by Freedlander. Therefore, Tyger's failure to seek alternative goods and to repudiate the contract fatally undermines its claim of economic duress.
 
 
 18
 Still, Tyger contends that Beer violated its obligation under Section 2-209 of the Uniform Commercial Code[1] to act in good faith, because Beer extorted a modification of the contract by waiting until it had received payments of $542,000 on February 1, 1985, before refusing to proceed unless it received an increase in the contract price, and by falsely representing that the increase was warranted by the requirements of an erection contractor and a shipper. The district court did not address the UCC issue but it is apparent that Tyger failed to meet its burden of proof. Assuming without deciding that the parties' contract is one for goods and thus within the scope of the UCC, Tyger does not give any evidence of bad faith, such as threats, and instead relies on debatable inferences based on contested evidence. The record does not enable us to conclude one way or another that Beer's claims of increased costs were false or that Beer thought its claims were false. If anything, the record reveals that Tyger itself contributed to the delay by neglecting to respond quickly to Beer's sufficiently explained requests for greater compensation. For these reasons, the district court did not err in implicitly rejecting Tyger's UCC allegations.
 
 C
 
 19
 Finally, Tyger appeals the district court's holding that Tyger's termination of the contract was wrongful. The record indicates that Tyger wrote a letter to Beer on March 17, 1986, stating, in part, that Tyger would terminate the contract if it did not "receive, within 10 days, a positive response and commitment indicating [Beer's] intent to remobilize and undertake the required remaining work ...." When Beer failed to respond, Tyger terminated the contract on March 31, 1986. The district court found that "Tyger was not entitled unilaterally to impose new conditions" on the contract in the March 17, 1986, letter and that "Tyger's reliance on this unilaterally imposed condition in terminating Beer constituted wrongful termination."
 
 
 20
 Tyger contends that it was entitled to impose this condition because Beer's suspension of its contract guaranty on February 24, 1986, constituted repudiation of the contract, giving Tyger the right, under Paragraph 19 of the contract,[2] to request Beer's affirmation of the contract. Yet this suspension of the guaranty was not a material breach as Beer had substantially completed its work under the contract on January 10, 1986. The district court found this as a matter of fact, and Tyger fails to show that it is clearly erroneous. As a result, Tyger was not entitled to terminate the contract, as the district court correctly held.
 
 III
 
 21
 This case presented a mare's nest of conflicting claims and contradictory testimony. We conclude that the findings of the district court are not clearly erroneous, and its application of the law was correct.
 
 
 22
 AFFIRMED.
 
 
 
 [1]
 Section 2-209(1) states that "[a]n agreement modifying a contract within this title needs no consideration to be binding." Virginia Code Ann. Sec. 8.2-209(1) (1965). However, the Official Comment qualifies this subsection:
 However, modifications made [under this section] must meet the test of good faith imposed by this Act. The effective use of bad faith to escape performance on the original contract terms is barred, and the extortion of a "modification" without legitimate commercial reason is ineffective as a violation of the duty of good faith.
 The test of "good faith" between merchants or as against merchants includes "observance of reasonable commercial standards of fair dealing in the trade" (Section [8.]2-103), and may in some situations require an objectively demonstrable reason for seeking a modification.
 Id., Official Comment 2.
 
 
 [2]
 Paragraph 19 is entitled "Default of Subcontractor" and reads in pertinent part:
 If Subcontractor fails to prosecute the work, or any specific part thereof, with due diligence, or fails to fully and promptly perform any of its obligations hereunder, ... or otherwise defaults under this Subcontract, Contractor may, by written notice to Subcontractor, terminate the right to proceed with all or any part of the work.