# Staunton

CLARENCE W. BOGGS AND KATHLEEN BOGGS v. PERCY L. DUNCAN.

September 8, 1961.

Record No. 5276.

Present, All the Justices.

r

The opinion states the case.

*E. Jackson Boggs* (*George F. Abbitt, Jr.; William F. Watkins, Jr.,* on brief), for the plaintiffs in error.

*William R. Blandford* (*J. Taylor Williams; Leslie L. Mason, Jr.,* on brief), for the defendant in error.

EGGLESTON, C. J., delivered the opinion of the court.

Clarence W. Boggs and Kathleen Boggs, his wife, sometimes hereinafter called the plaintiffs, filed their motion for judgment against Percy L. Duncan, sometimes hereinafter called the defendant, to recover damages for the alleged breach of a contract whereby the plaintiffs sold to Duncan certain timber which he agreed to cut and remove within a specified time and to pay the plaintiffs therefor. The defendant, Duncan, filed a general denial of the allegation that he had breached the contract and a counterclaim alleging that the plaintiffs had wrongfully prevented him from performing the contract, as the result of which he had suffered a loss of the profits he would have realized from the transaction. He claimed additional damages of the plaintiffs for the loss of time, expenses and "injury to his reputation and business" occasioned by the plaintiffs' "unlawful institution" of their action against him.

There was a trial by a jury, resulting in a verdict and judgment which disallowed the plaintiffs' claim and awarded the defendant the sum of $5,000 on his cross-claim. To review that judgment a writ of error was awarded the plaintiffs.

In their assignments of error the plaintiffs challenge the sufficiency of the evidence to sustain the finding that they prevented the performance of the contract and the finding as to the damages awarded the defendant on his cross-claim. The plaintiffs say that the evidence shows that the defendant breached the contract and should be held liable therefor to them in damages. They further contend that the

trial court erred in admitting in evidence a certain letter written by the attorney for the defendant to the attorney for the plaintiffs.

The evidence, which is before us in narrative form, is unsatisfactory and confusing both in form and substance. However, under elementary principles, it should be stated and reviewed in the light most favorable to the defendant who prevailed in the trial below.

On February 10, 1956, the parties entered into a written contract whereby the plaintiffs, Boggs and wife, sold and conveyed to the defendant, Duncan, "all merchantable timber, pine and poplar to the size of eight (8) inches at the ground," and "also any hardwood timber, except cedar and locust, he may see fit to cut," located on a certain tract of 377.4 acres of land owned by the plaintiffs. Under the terms of the contract Duncan agreed to cut and remove the timber within two and one-half years and pay therefor at the rate of "$22.50 per M Log measurement, if logs are moved from the tract," or the same price "per M Board measurement if logs are manufactured on the premises." Duncan was to have "the right of ingress and egress" over the land for the purpose of cutting, hauling and removing the timber, and was to repair any damage done to the fences in the operation.

Duncan began to cut the timber shortly after the contract was signed, in February, 1956, and so continued until the "latter part" of that year. By that time, although about one-half of the timberland had been cut over, the operation had yielded to the plaintiffs approximately $8,000, which was considerably less than they had anticipated. Early in 1957, the exact date not being shown, Boggs complained to Duncan about this situation and also the fact that only pine and poplar timber, but no hardwood, was being cut. Duncan suggested that the situation might be improved if a sawmill was placed on the premises. However, this was not done.

No timber was cut during the months of January, February or March, 1957, and until the operations were resumed on April 6. Around the middle of May, 1957, Boggs complained to Duncan's agent that the damage to the fences was not being repaired as required by the terms of the contract. About the same time Boggs, being still dissatisfied with the small amount of timber which had been cut, consulted his attorney, George F. Abbitt, Jr., who advised that they should arrange a conference with Duncan as to the matter. Thereafter these letters passed:

Under date of May 20, 1957, Abbitt wrote Duncan that Boggs had consulted him about the "timber operations" under the contract. Continuing, the letter said:

"Mr. Boggs is seriously concerned about your timber operations and, also, just exactly what the true status of the relationship between you and him is at the present time.

"Therefore, will you please discontinue further timber operations until we can have a conference and establish and agree exactly as to what your obligation is to Boggs and what his obligation is to you.

"In other words, I think it would be discreet for both of you if you would hold up immediately further timber operations until there can be a full understanding and meeting of the minds as to what the present responsibilities are of you to him and from him to you.

"I will appreciate it if you will let me hear from you without delay."

To this letter Duncan replied under date of May 23, agreeing to the suggested conference. Under date of May 27 Abbitt wrote Duncan acknowledging receipt of his letter and stating:

"I trust that in the meantime you will discontinue your timber operations, as I believe this would be conducive to a better understanding between you and Mr. Boggs.

"I am today writing to Clarence asking him to let me know some suitable time so we can arrange to get together to see if we can work out a solution to the differences between you and Mr. Boggs."

Following this exchange of letters there were a number of conferences during the next succeeding two months in which there was an effort to settle the differences which had arisen between the parties. At one time it was suggested that the contract be canceled and that Boggs sell the remaining timber to Duncan, but they were unable to agree on a price and this plan was abandoned. Other plans were discussed but rejected. In the meantime the timber cutting operations had ceased.

Duncan testified that he ceased operations because of Abbitt's letter to him of May 20, 1957, and did not resume such operations because thereafter he was never "affirmatively requested" to do so by either the plaintiffs or their attorney. Moreover, Duncan testified that throughout the operations under the contract, Boggs made unreasonable demands on him and continuously "harassed" him about the manner in which the timber was being cut and measured. This was corroborated by Mrs. Moe Duncan who was in charge of the cutting operations for the defendant.

Again, Duncan said that on or about July 20, 1957, Boggs, accompanied by E. E. Tipton, came to see him to discuss the removal of certain pulpwood by Tipton from the Boggs land under a separate

contract, and that during this conversation Boggs told him (Duncan) "to stay off my place." Mrs. Moe Duncan, the employee of the defendant, testified that after the cutting operations had come to a halt in May, Boggs made a similar remark to her.

On the other hand, there is evidence on behalf of the plaintiffs that they were quite desirous of having the contract performed and that "personally" they had done nothing to prevent this. Boggs denied that he had forbidden Duncan to come on his land, as the latter had testified. Tipton, who was present at this interview, said that he "did not hear" this forbiddance.

There is also evidence which tended to show that Duncan had ceased his operations under the contract not because of the letters which he had received from Abbitt, or because of any other interference on the part of the plaintiffs, but because of a fall in the timber market which had made the operations unprofitable.

Over the objection of the plaintiffs there was introduced in evidence a letter dated October 16, 1957, from William R. Blandford, attorney for Duncan, to Abbitt, the attorney for the Boggs, stating that Duncan was "ready, willing and able" to resume operations under the contract upon written assurance that Boggs would not further interfere with him. Abbitt replied to this letter but because of certain "remarks" concerning Boggs which Abbitt asked Blandford "to treat as confidential," and which Abbitt insisted should be withheld from the jury, the reply was not admitted in evidence. Nor are we apprised of the contents of this reply. At any rate, the operations under the contract were not resumed.

The factual issues as to whether the performance of the contract was prevented by the Boggs, or whether Duncan had abandoned and breached the contract, were squarely submitted to the jury in a number of instructions to which neither side objected. The jury were instructed that under the terms of the contract it was the duty of Duncan to cut and remove the timber within the period agreed upon "unless he was prevented" from doing so "by the sellers or either one of them." Again, they were instructed that if they believed from the evidence that Duncan "breached the contract" and "without legal cause failed to comply with the terms of the said contract and failed to cut the said timber," they should find for the plaintiffs, the Boggs.

On the other hand, the jury were instructed that if they believed from the evidence that Duncan "commenced the performance of the contract * * * and continued to cut and remove" the timber in accordance with its terms and that prior to the expiration of the con-

tract "the plaintiffs or either of them * * * prevented the defendant from further performance and from completion of said contract, such action on the part of the plaintiffs constituted a breach of the contract by them which would not only bar the plaintiffs from any recovery, but which would entitle the defendant to recover any damages suffered as set forth in his counterclaim."

We find the evidence sufficient to sustain the verdict of the jury that the conduct of the plaintiffs and their attorney prevented the performance of the contract by Duncan. While Abbitt's letters to Duncan were polite in form, their obvious purpose was to put an end to the timber cutting operation until there could be "a full understanding and meeting of the minds" of the parties as to their mutual "responsibilities." The clear implication is that until this condition had been met the work was not to be resumed. It is likewise clear that this condition, specified by the attorney and agent for the plaintiffs, was never met. In the meantime, as has been said, Duncan had been directed by Boggs to stay off his premises.

The jury's verdict having concluded the issue that the plaintiffs prevented the performance of the contract, it necessarily follows that they are not entitled to recover damages of the defendant for nonperformance. As is said in 12 Am. Jur., Contracts, § 381, pp. 957, 958, "A plaintiff cannot prevail in an action for nonperformance of a contract, for which nonperformance he alone is responsible. If the impossibility of performance arises directly or even indirectly from the acts of the promisee, it is sufficient excuse for nonperformance. This is upon the principle that he who prevents a thing may not avail himself of the nonperformance which he has occasioned." See also, *Burton* v. *Seifert & Company*, 108 Va. 338, 358, 61 S. E. 933.

"Moreover, such prevention is a breach of the contract by the party so preventing performance and renders him liable to pay damages. The party prevented from performing is at liberty to treat the contract as broken and abandon it and recover as damages the profits which he would have received through full performance. In other words, such party may regard it as terminated and demand whatever damage he has sustained thereby." 12 Am. Jur., Contracts, § 386, pp. 961, 962. See also, 17 C. J. S., Contracts, § 424, p. 910.

*Billings* v. *Killen*, 111 W. Va. 551, 162 S. E. 892, is quite similar to the case before us. There Billings had entered into a contract to cut and deliver a large quantity of timber to a mill of the defendant, Killen. Billings claimed that Killen prevented his performance of the contract, commanding him to get off the premises and depriving him of the

teams and other means of performing the contract. Killen claimed that Billings had voluntarily abandoned the project. In a suit for damages for breach of contract Billings recovered a verdict and judgment for loss of profits which he would have realized out of the transaction. In affirming the judgment the highest court of West Virginia held that the verdict of the jury had settled in Billings' favor the contention that Killen had prevented the performance of the contract and that such conduct on the part of Killen constituted a breach of contract which entitled Billings to the damages sought.

In the present case the instructions to the jury, to which we have referred and to which neither side objected, were in accordance with these principles.

As has been said, on his cross-claim the defendant alleged two items of damages: (1) Loss of profits which he would have made out of the contract if the performance had not been prevented; and (2) Damages by way of loss of time, expenses and "injury to his reputation and business" because of the plaintiffs' unlawful institution of the original action.

With respect to the alleged loss of profits, the defendant testified that if he had been allowed to cut all of the timber he "would have made a profit," as he usually did in his operations, and that "he believed" his loss in this instance amounted to $6,000. W. P. Sanderson, testifying for the defendant, said that he had "walked over" the timber tract; that he estimated that there remained from 650,000 to 700,000 feet of pine and poplar timber on the property; and that "in his opinion Mr. Duncan should have made a profit thereon of $6,000." This is all of the evidence on the subject. It is inadequate to sustain the jury's finding of $5,000 in favor of the defendant for his alleged loss of profits.

It is well settled that damages are recoverable for loss of profits prevented by a breach of contract "only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." Restatement of the Law of Contracts, Vol. 1, § 331, p. 515. See also, *Polar Steamship Corp.* v. *Inland Overseas Steamship Corp.*, 4 Cir., 136 F. 2d 835, 841, certiorari denied 320 U. S. 774, 64 S. Ct. 83, 88 L. ed. 464. Moreover, profits which are remote, speculative, contingent or uncertain are not recoverable. *Haywood* v. *Massie*, 188 Va. 176, 180, 49 S. E. 2d 281, 283, and authorities there cited.

In the present case there is no evidence upon which the alleged loss of profits can be ascertained or calculated with reasonable certainty.

There is no showing as to the estimated cost of removing the remaining timber on the land, the price or prices at which it might probably be sold, the expenses of such sale, and the net profit to be derived from the operation. We have merely the opinion of the defendant himself, supported by that of another witness, that the defendant would or should have made a profit of $6,000 had he been permitted to complete the contract. Such opinions, unsupported by any data, facts or figures upon which they are based, are insufficient to prove with the required certainty the alleged loss of profits. See *Shenandoah Milling Co.* v. *Phosphate Products Corp.*, 161 Va. 642, 650, 171 S. E. 681.

The defendant testified that "his reputation was damaged to the extent of $4,000." Although he did not say so, presumably this related to the alleged injury to his reputation caused by the wrongful institution of this action against him by the plaintiffs. Aside from the obvious inadequacy of proof of such alleged damages, it is well settled that in the absence of statute, whenever an injury results from the issuance of judicial process in a civil action, the person procuring its issuance incurs no legal responsibility provided he acts in good faith and in honest conviction that the remedy is necessary to the enforcement of a legal right. 72 C. J. S., Process, § 120-a, p. 1189; 1 C. J. S., Actions, § 15, p. 1008; 1 Am. Jur., Actions, § 32, p. 424, § 33, p. 425.

Here there is no showing that the plaintiffs instituted this action in bad faith or with lack of conviction that it was necessary to protect their rights. Hence, there is no legal basis for the defendant's claim of damage to his "reputation."

The verdict of the jury awarding damages to the defendant on his cross-claim being without evidence to support it should have been set aside by the trial court.

The plaintiffs insist that the letter of October 16, 1957, from Blandford to Abbitt, referred to above, was a self-serving declaration and inadmissible. There is no merit in this contention. The letter was a part of the general correspondence and negotiations which had been going on between the parties and their attorneys for months. It was quite relevant to the attitude of the parties with respect to the interpretation and continuation of the contract. As is said in 31 C. J. S., Evidence, § 216-b, p. 955, "Letters which are a part of a general or mutual correspondence and which are relevant to the issue are admissible although some of them may contain self-serving declarations." See also, *M. Shapiro & Son Const. Co.* v. *Battaglia*, 138 Conn. 238, 83 A. 2d 204, 208, and cases there cited.

In so far as the judgment complained of disallowed the plaintiffs' claim it is affirmed. The judgment in favor of the defendant on his cross-claim against the plaintiffs is reversed, the verdict set aside, and final judgment will be here entered in favor of the plaintiffs on such cross-claim. The plaintiffs having substantially prevailed on this appeal will recover their costs of the defendant.

*Affirmed in part; reversed in part, and final judgment.*