**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GARY LIGHT; SOUTHERN GOLF
DEVELOPMENT, INCORPORATED,
<u>Plaintiffs-Appellees,</u>

v.

BEAVER CREEK DEVELOPMENT

No. 97-1043

PARTNERS; JOHN SULLIVAN; JOSEPH
SULLIVAN; MARSH FINANCIAL,
INCORPORATED; LEXINGTON REALTY
SERVICES, INCORPORATED,
<u>Defendants-Appellants.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Chief District Judge.
(CA-96-107-A)

Argued: July 16, 1997

Decided: September 30, 1997

Before MURNAGHAN, Circuit Judge, BUTZNER,
Senior Circuit Judge, and FOX, Chief United States District Judge
for the Eastern District of North Carolina, sitting by designation.

_____

Reversed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Beth Ann Blackwood, BLACKWOOD & MADDEN,
L.L.P., Dallas, Texas, for Appellants. William McCauley Arnold,

MCCANDLISH & LILLARD, P.C., Fairfax, Virginia, for Appellees.
**ON BRIEF:** Mitchell Madden, Michelle Nicaud, BLACKWOOD &
MADDEN, L.L.P., Dallas, Texas, for Appellants. Patrick M. Pickett,
MCCANDLISH & LILLARD, P.C., Fairfax, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Gary Light and Southern Golf Development, Inc. ("Light") and
Beaver Creek Development Partners ("Beaver Creek") entered into an
agreement hoping that they could develop a golf course and residen-
tial community. For a number of reasons, the property on which the
development was to be built was not purchased and the envisioned
golf course and residential community was never constructed. Gary
Light sued Beaver Creek alleging breach of contract. The district
court held for Light and ordered Beaver Creek to pay Light $250,000.
Since we believe that Light did not perform a necessary condition
precedent for recovery, we reverse the decision by the district court.

I. FACTS

In 1992 Ed Alfriend, the owner of two of the four parcels of land
at issue in the instant case, approached Gary Light about developing
the land into a golf course community. Light, a resident of Georgia
and an officer in Southern Golf Development, Inc., was in the busi-
ness of developing golf courses.

Light contacted other nearby landholders, and proceeded to enter
into option contracts to buy the land at issue. [1] The proposed site con-

_____

[1] There is some debate about whether the contracts at issue were option
contracts. The contracts were either option contracts or purchase agree-
ments with provisions limiting damages for nonperformance by the
buyer to the initial deposit amount. For the purposes of the analysis in
the present case, all the contracts operated as option contracts.

2

sisted of four parcels: the Asdee Lane parcel which consisted of the Mosser and McMurtry tract,[2] the Forbes parcel, and the Asdee Land parcel.[3] In addition to entering into option contracts to purchase the properties at issue, Light also contacted the Prince William County Park Authority and got "conceptual approval" of the project.

At the time Light entered into the option contracts, the land was not properly zoned for a golf course and residential community. Thus, the golf course venture was highly speculative because rezoning was uncertain. In addition, Light did not have the capital to execute the option contracts at issue so Light needed to find an investor. Light sought an investor who would give him an equity share in the development based on his work on the project. Light could not find a suitable investor and later entered into an agreement with Beaver Creek. Beaver Creek did not provide Light with an equity share but agreed to pay Light for his work. In addition, Light was entitled to additional payments if certain conditions were met.

Light and Beaver Creek executed an assignment agreement whereby Light assigned his rights to purchase the properties at issue to Beaver Creek and Beaver Creek agreed to provide funding for planning, zoning, and acquisition of the land. Light was responsible for developing and obtaining funding for the golf course. It is the assignment agreement which forms the basis of Light's breach of contract claim.

The assignment agreement provided that Light would assign all of his rights to purchase the four tracts of land to Beaver Creek.[4] Beaver

_____

[2] Light entered into an option contract to buy two parcels from Alfriend aggregately identified as the Asdee Lane parcel. The first parcel was the Mosser parcel and the second was the McMurtry parcel. At the time Light entered into the contract with Alfriend, Alfriend was about to go into bankruptcy. The two parcels are identified based on the parties who held the first mortgage on each parcel.

[3] Asdee Lane and Asdee Land are two separate parcels. Asdee Lane was owned by Alfriend, Asdee Land by Cowles.

[4] The original option contracts expired after six months. Since it took over two years for zoning to be approved, Beaver Creek needed to purchase extensions on each of the option contracts.

3

Creek was to pay Light $30,000 after a three-day review period expired. Light was also entitled to an additional $70,000 within ten days from the date of approval of the zoning application.

In addition, Beaver Creek was responsible for all duties under the assignment contracts, including earnest money deposits. Beaver Creek also agreed to pay all reasonable costs incurred after the end of the review period (three days) in connection with the zoning of the property.

The assignment agreement also provided: "Subject to and contingent upon the closing of all of the Contracts and the funding of financing to cover the costs of the Golf Course (the`financing'), [Beaver Creek] shall pay to [Light] a fee of $400,000." The fee would be reduced to $250,000 if the zoning board approved a smaller than projected number of housing units.

The assignment agreement also provided that Light would only be entitled to the $250,000 payment if Light obtained financing for the project within ninety days from the date of the zoning approval. The assignment agreement provided:

> Notwithstanding anything contained herein, in the event the financing is not obtained within 90 days from the date of zoning and site plan approval for the Beaver Creek Development, Assignee will have no obligation to pay the $400,000 as described in [the assignment agreement].

Under the assignment agreement, Beaver Creek was responsible for acquiring and developing the residential portion of the land. Once all contingencies for developing the golf course were in place, Beaver Creek agreed to convey the portion of land for the golf course to the county for development by Light as a golf course.

For various reasons, Beaver Creek failed to purchase all but one of the four parcels.[5] Since the failure to purchase the property ultimately

_____

[5] Beaver Creek did not actually purchase any of the parcels. Beaver Creek assigned its right to purchase the Cowles tract to Blue Ridge, a corporation set up for the purpose of buying the Cowles tract. Blue Ridge purchased the Cowles tract.

4

led to the breach of contract claim, we will briefly discuss the actions which led to Beaver Creek's failure to purchase each property. However, since the Court's holding ultimately rests on the fact that Light failed to perform the condition precedent necessary for him to recover, Beaver Creek's failure to close the land contracts is not directly at issue in the present case.

Asdee Lane (McMurtry)

Asdee Lane consisted of two parcels, the Mosser parcel and the McMurtry parcel. These parcels were owned by Alfriend, but Mosser and McMurtry held the first mortgage on each parcel.

At the time the assignment contract was signed, Alfriend was in bankruptcy and the creditors had made a motion in bankruptcy court to lift the stay and allow foreclosure on the McMurtry parcel. The court ordered that if the note and interest secured by the McMurtry property were not paid by July 1, 1994, the creditors could foreclose. The bankruptcy court set out a plan for the property and determined that the notes could be satisfied out of the financing and payment of the purchase price between Alfriend and Light prior to July 1, 1994. The order further required that 1) a payment of $22,500 be made on or before December 17, 1993; 2) a payment of $15,000 be paid on or before April 1, 1994; and 3) a firm commitment from an institutional lender for the purchase price be obtained within 24 hours.

Beaver Creek alleges that it was not aware of the bankruptcy court order when it entered into the assignment contract. The district court found, as a factual finding, that Beaver Creek knew of the order as of January 4, 1994 which was two weeks after the assignment agreement was signed. Beaver Creek further alleges that it could not have met the bankruptcy court's requirements since its funding source was not from an institutional lender. Light argues that Beaver Creek agreed to perform as required by the consent order. **6**

_____

**6** Even Light does not argue that Beaver Creek knew the entire contents of the bankruptcy order. In the assignment agreement, Beaver Creek provided funds for down payments on the properties, and Light used that money to make the first payment under the bankruptcy court order. In fact, Light admitted, "I'm not sure of the sequence of when I spoke with him. The payment was made sometime in late December, but I'm not sure if I had spoken with him at that point."

5

The lender later instituted foreclosure proceedings because the conditions under the bankruptcy order had not been fulfilled. Alfred Cowley, a friend and former business partner of Light, purchased the McMurtry note prior to foreclosure. Light told Beaver Creek that Cowley bought the note and that he was "friendly."

Unbeknownst to Beaver Creek, Cowley, Light, and Alfriend entered into an agreement regarding the McMurtry tract. Alfriend gave Cowley a deed in lieu of foreclosure, and Light agreed to pay Alfriend $50,000 as a consulting fee on the project. [7] Light then, on behalf of Beaver Creek, negotiated an extension of the option contract on Alfriend's former property. Light negotiated this extension without telling Beaver Creek that Alfriend no longer owned the property, and had given Cowley a deed in lieu of foreclosure.

According to Beaver Creek, as the note was becoming due, Light assured Beaver Creek that Cowley would agree to another extension. However, Cowley refused to do so. Beaver Creek claims that it assumed that it could protect its interest at foreclosure if Cowley ever foreclosed on the note so it did not take any action regarding the inability to get an extension on the note.[8]

However, Beaver Creek could not bid on the property at foreclosure since Cowley had a deed in lieu of foreclosure. When Beaver Creek failed to pay $15,000 required to maintain the current extension, Cowley filed the deed. On May 8, 1995, Cowley repudiated the contract and said that he had no obligation to Beaver Creek since the extension payment had not been made. Thus, Beaver Creek never closed on the McMurtry parcel.

_____

[7] Moreover, Alfriend was entitled to half the profits from the sale of the McMurtry property if the property was sold back to Beaver Creek. However, Alfriend was not entitled to any additional compensation if the property was sold to another party. Thus, Cowley had a financial incentive to encourage another party to purchase and develop the property, since he would then not have to split the profits with Alfriend.

[8] Beaver Creek had no obligation on the note. Alfriend was still obligated to pay Cowley under the note.

### Asdee Lane (Mosser tract)

Alfriend died and the remaining Asdee Lane tract became part of his estate. The tract was scheduled to close July 24, 1995. His estate was represented by Robert Rausch. Beaver Creek argues that Rausch refused to settle under the terms of the original contract. The original contract allowed Beaver Creek to pay off the notes and then take back financing from the seller. It did not require an all cash closing. Rausch preferred an all cash closing and did not believe that provision applied because he did not believe that Beaver Creek had satisfied the conditions for deferred financing. Beaver Creek then offered Rausch $30,000 cash, and Rausch asked for $300,000.

Rausch also testified that Beaver Creek believed that it was the only party who could develop the land since the zoning for the golf course required all four parcels. It told Rausch that it believed it could get the land cheaper at foreclosure. The district court gave great weight to Rausch's testimony.

### Forbes Tract

Forbes was the owner of one of the parcels at issue. Beaver Creek paid Forbes over $150,000 over two years to obtain contract extensions to purchase the property. Beaver Creek tried to negotiate another extension. When Forbes refused, Beaver Creek allegedly attempted to buy the parcel. Beaver Creek claims that Forbes would not give the closing information to Beaver Creek, and that it called the title company over twenty times to obtain the required information. Forbes denies that Beaver Creek made any attempt to close.

Forbes now refuses to sell the property to Beaver Creek. In addition, Forbes is now selling the property for $1.1 million which is $300,000 over the original contract price. Moreover, Forbes confirmed that Light has tried to purchase the property, and that Light currently has an option on Forbes's property.

### Asdee Land (Cowles tract)

Beaver Creek assigned its right to purchase the Cowles tract to Blue Ridge Corporation. Blue Ridge was formed by Beaver Creek's

lawyer for the sole purpose of buying the Cowles tract. According to Beaver Creek, Light's suit had already been filed and Beaver Creek's financing source believed that it would be better for another party to hold title to the Cowles tract. Blue Ridge purchased the Cowles tract and, according to Beaver Creek, the Park Authority accepted the third party purchase.

Payment of Services

In addition to the acquisition of the land, there is a controversy regarding whether Beaver Creek paid professionals involved in the project. The district court found that Beaver Creek breached the assignment contract by not paying the professionals involved in the contract. Beaver Creek asserts that the professionals were paid, and that even if they were not, the failure to pay professionals had no impact on Light since the zoning on the property was approved.

The district court determined that Beaver Creek breached the assignment agreement 1) by not timely paying professional fees as required by the assignment agreement; 2) by not making payment on the McMurtry property as required by the bankruptcy court; and 3) by not closing the land contracts in question. The district court held that Beaver Creek's breach of the assignment agreement excused Light's performance and awarded Light $250,000. Since Light's duty to perform was independent of any duty on the part of Beaver Creek, we reverse.

II. DISCUSSION

In deciding whether Light is entitled to $250,000 we must determine whether a breach on the part of Beaver Creek entitled Light to collect even if Light did not perform a necessary condition precedent to recovery. We interpret the contract de novo . L.K. Comstock & Co. v. United Eng. & Constructors, 880 F.2d 219, 221 (9th Cir. 1989) ("In general ... principles of contract interpretation applied to the facts are reviewed de novo.").

In order to recover under a contract, the party seeking recovery must prove the performance of any conditions precedent upon which

8

his right of recovery depends. <u>Morotock Ins. Co. v. Fostoria Novelty Glass Co.</u>, 26 S.E. 850, 851 (Va. 1897). "A condition precedent calls for the performance of some act or the happening of some event after the terms of the contract have been agreed upon, before the contract shall take effect." <u>Id.</u>

Where a contract requires the performance of a condition precedent, the condition precedent must be performed before payment is due. Restatement (Second) of Contracts § 225 (1981). However, a party to the contract is under a duty not to prevent performance by the other party. <u>In re LCS Homes</u>, 103 B.R. 736, 743 (E.D.Va. 1989); <u>see also Boggs v. Duncun</u>, 121 S.E. 2d 359, 362 (Va. 1961). However, such a duty does not arise "when the hindrance is due to some action of the promisor which he was permitted to take under either the express or implied terms of the contract." <u>Whitt v. Godwin</u>, 139 S.E.2d 841, 844 (Va. 1965). In addition, for a party's breach to excuse the performance of the condition precedent, the breach must materially contribute to the other party's inability to perform the condition precedent. Restatement (Second) § 245 (1981).

Paragraph 5 of the assignment agreement provided:"Subject to and contingent upon the closing of all of the Contracts and the funding of financing to cover the costs of the Golf Course (the`financing'), Assignee shall pay to Assignor a fee of $400,000." Paragraph 8 of the agreement further provided:

> Notwithstanding anything contained herein, in the event the financing is not obtained within 90 days from the date of zoning and site plan approval for the Beaver Creek Development, Assignee will have no obligation to pay the $400,000[9] as described in paragraph 5 hereof.

Therefore, the assignment agreement provided that Light would receive $250,000 if he obtained financing within ninety days from

_____

[9] Paragraph 10 provides "In the event zoning is not obtained for a minimum of 256 residential lots in the property, then the $400,000 payment described in paragraph 5 hereof shall be reduced by $15,000 per lot, but in no event shall said payment be less than $250,000." The parties agree that the proper payment would have been $250,000.

9

zoning. This obligation is independent of any obligation on the part of Beaver Creek, and obtaining financing was a condition precedent to Light's recovery. Beaver Creek is neither obligated to close the land contracts nor assist Light in his efforts to obtain financing. Beaver Creek cannot obstruct Light's efforts, but Beaver Creek need not take any affirmative action to aid Light unless such action is required by the contract. Whitt, 139 S.E.2d at 840.

In Whitt, Whitt sold Godwin $12,000 worth of shares in Whitt's corporation. Whitt paid the money to a mortgage company in order to obtain a construction loan. The mortgage company's practices were questionable and Whitt sought a refund of his money. The mortgage company agreed to refund half of the $12,000 and agreed to return the remaining half minus expenses. Whitt then entered into an agreement to refund Godwin's $12,000 in exchange for Godwin's shares in the company. Whitt agreed to pay Godwin all the money which he received from the mortgage company plus any difference between the amount Whitt received and the $12,000. Id. at 843. The mortgage company refused to refund any money to Whitt unless Whitt and Godwin signed a release. Godwin refused to sign the release, and Whitt argued that Godwin's refusal excused Whitt's performance. Id. The court held that Whitt had an independent obligation to Godwin to refund the $12,000 and that Godwin had no obligation to sign a release. The court further held that Godwin's refusal to sign the release was neither wrongful nor in excess of his legal rights. Id.

In the instant case, just as in Whitt, Beaver Creek had no obligation to assist Light by purchasing the land in question. Moreover, just as in Whitt, Light's obligation was independent of any obligation on the part of Beaver Creek. Since it is undisputed that Light did not obtain financing within ninety days of zoning as required by paragraph 8, Light did not fulfill the conditions precedent to recovery and is not entitled to $250,000. Therefore, Light would only be entitled to recovery if he could point to a breach on the part of Beaver Creek which prevented him from performing the condition precedent.

Light first argues that Beaver Creek's failure to close on several pieces of property was a breach which impacted Light's ability to obtain financing. However, Beaver Creek had no obligation to purchase the property. The golf course community was a speculative

10

venture and Beaver Creek made no promise to Light that it would purchase the property. Moreover, even if Beaver Creek had an obligation to purchase the property under the assignment agreement, the contracts at issue had a duration of six months. Since zoning took two years, those contracts had long expired before the zoning had been approved. Beaver Creek had no obligation to purchase contract extensions, and it had no obligation to purchase the property before zoning had been approved. Thus, Light only had the opportunity to receive the $250,000 because Beaver Creek continued to purchase extensions of the land contracts and because zoning was finally approved. However, since Beaver Creek had no obligation to purchase those extensions, Light cannot argue that it was Beaver Creek's failure to purchase the property which created Light's inability to obtain financing. The fact that the property had not yet been purchased may have impacted Light's ability to obtain financing, but under the assignment agreement, Beaver Creek had no obligation to purchase the property.

The district court determined that Beaver Creek's 1) failure to pay professionals, 2) failure to purchase the McMurtry parcel, 3) delay in obtaining zoning and 4) assignment of the right to purchase the Cowles tract to a third party were breaches of the assignment agreement. We assume, without deciding, that the district court was correct and that Beaver Creek breached the assignment agreement. However, in order to recover, Light must show that one of these breaches on the part of Beaver Creek prevented his performance.

Beaver Creek's alleged failure to pay professional fees does not excuse Light's performance since there is no evidence that the failure to pay professional fees prevented Light from performing. The payments to professionals were either to obtain zoning approval, which was obtained, or to design the golf course. None of these payments impacted Light's ability to obtain financing.

Secondly, the district court found that Beaver Creek failed to fulfill the requirements of the bankruptcy order regarding the McMurtry property. Although there is serious doubt regarding whether Beaver Creek had any obligation under the bankruptcy order, even if Beaver Creek had such an obligation, the obligation did not prevent Light from performing the condition precedent necessary for it to recover. Light was entitled to $250,000, if it obtained financing within ninety

11

days of zoning. Light's obligation was independent and was not contingent on Beaver Creek's purchase of the property in question. Thus, Beaver Creek's failure to purchase the property did not excuse Light's performance.

In addition, at least with regard to the McMurtry property, Light's actions interfered with Beaver Creek's ability to purchase the property. Prior to any breach on the part of Beaver Creek regarding the McMurtry property, Light entered into an agreement with Cowley and Alfriend regarding the McMurtry tract in which Alfriend gave Cowley a deed in lieu of foreclosure, and Light agreed to pay Alfriend $50,000 as a consulting fee on the project. Light never informed Beaver Creek of the agreement. When Beaver Creek failed to make a timely extension payment Cowley recorded the deed. Light cannot now rely on Beaver Creek's failure to purchase the property since Light was instrumental in the transfer of the property to Cowley.

The district court also found that Beaver Creek breached the assignment agreement by delaying zoning. However, Light's duty to obtain financing did not mature until after zoning was obtained. Since zoning was in fact obtained and Light's obligation did not start until after the zoning was obtained, any delay in zoning did not impact Light's ability to obtain financing. Thus, the delay in zoning did not excuse Light's performance.

Finally, the district court determined that Beaver Creek breached the agreement by assigning its right to purchase the Cowles tract to a third party. However, there is no evidence that this transfer impacted Light's ability to perform. In fact, the purchase of the Cowles tract by a third party occurred after the suit had been instituted and after Light's obligation to obtain financing had already expired. Thus, Beaver Creek's assignment of the right to purchase the Cowles tract could not have impacted Light's obligation to obtain financing.

Thus, we conclude that Light had an independent obligation to obtain financing for the golf course project in order to receive $250,000. We further hold that none of the breaches cited by the district court excused Light's obligation and that Light is not entitled to collect $250,000.

12

Beaver Creek also asserts that the district court erred in not allowing Marsh Financial and Lexington Realty Services, two of the partners in Beaver Creek, to file a counterclaim. Light sought and was granted leave to file suit against the general partners of Beaver Creek, Marsh Financial and Lexington Realty Services. Marsh and Lexington timely filed an answer and a counterclaim. The district court dismissed the counterclaim holding that the claim belonged to Beaver Creek and Beaver Creek had waived its right to file such a counterclaim.

Under F.R.C.P. 13(a) Beaver Creek's counterclaim was a compulsory counterclaim, and thus Beaver Creek was required to file the counterclaim with its response. Beaver Creek failed to do so. Thus, Beaver Creek lost its right to file such a claim when it failed to do so in its answer.

After the district court granted Light's motion to add Marsh Financial and Lexington Realty Services, Marsh and Lexington attempted to assert Beaver Creek's waived counterclaim. The district court denied Marsh and Lexington's motion arguing that the counterclaim was in fact a claim on behalf of Beaver Creek. It determined that all six counterclaims address injuries to Beaver Creek, and did not impact Marsh and Lexington. Since Beaver Creek originally failed to state a compulsory counterclaim and since the counterclaim filed by Lexington and Marsh was really Beaver Creek's counterclaim, the district court did not abuse its discretion in denying the claim.

Beaver Creek also sought leave of the court to file a counterclaim; however, Beaver Creek did so after the case had already been tried before the district court. Under the circumstances in the instant case, it was not unreasonable for the district court to deny Beaver Creek leave to file a counterclaim.

Finally, Beaver Creek argues that the district court erred in holding Joe Sullivan personally liable. However, we need not reach that issue since we find no liability on the part of Beaver Creek.

The judgment is

REVERSED.

13