PRESENT:  All the Justices

RASTEK CONSTRUCTION &
DEVELOPMENT CORPORATION

                                      OPINION BY

v.  Record No. 161549                 JUSTICE D. ARTHUR KELSEY
                                      NOVEMBER 30, 2017

GENERAL LAND COMMERCIAL REAL
ESTATE COMPANY, LLC

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Timothy J. Hauler, Judge

In this case, a real estate broker, General Land Commercial Real Estate Company, LLC

(the "Broker"), sued Rastek Construction & Development Corporation (the "Seller") to obtain a

sales commission despite the fact that the contemplated sale ultimately never took place.

Awarding the sales commission to the Broker, the trial court held that (i) the Broker was a third-

party beneficiary of the sale agreement, (ii) the parties to the sale agreement waived its time-is-

of-the-essence provision, and (iii) the Seller improperly prevented the closing.

The Seller appeals each of these holdings and contends that error on any one of them

warrants reversal.  We reverse the judgment below and hold that the trial court erred as a matter

of law by finding that the Seller improperly prevented the closing.

I.

In 2010, the Seller agreed to sell a parcel of commercial real property to G & G Harley

Club, LLC (the "Buyer").  They settled on a purchase price of $3,000,000 and agreed that

"[c]losing shall take place no later than October 1, 2010, time being of the essence."  2 J.A. at

661.  When the closing did not occur on October 1, 2010, the deal eventually became subject to a

"short sale" that had to be approved by Union First Market Bank (the "Lender").  *Id.* at 671-72.

The Lender held a deed of trust on the property that could potentially exceed the property's net

sales price. *See id.* The short-sale agreement, among other things, provided additional funds for the Seller to finish the construction of a commercial building on the property, released a portion of the parcel from the lien for a payment of $1,620,000 at closing, and stipulated that the closing must take place no later than March 31, 2011. *See id.*

The sale agreement between the Seller and the Buyer also included multiple conditions precedent to closing, which, if unsatisfied by the closing date, would permit termination of the agreement by "either party" through "written notice to the other party." *Id.* at 662. Upon such termination, "neither Seller nor Purchaser shall have any liability hereunder except for any obligations which expressly survive the termination of this Agreement." *Id.* One of the conditions precedent to closing listed in the sale agreement provided that "Seller or Purchaser shall have obtained a *final* Certificate of Occupancy from Chesterfield County." *Id.* (emphasis added). The Broker introduced a "*Temporary* Certificate of Occupancy" into evidence that was obtained from Chesterfield County on January 6, 2012. *Id.* at 681-82 (emphasis added).[1]

The Broker was not a named party to the sale agreement and did not sign it. The Seller and the Buyer, however, included a provision in their sale agreement stating that the "Seller shall pay a real estate commission fee . . . at the closing . . . to [the Broker] *if and only if closing occurs*." *Id.* at 663 (emphasis added).

Instead of terminating the sale agreement when the closing did not take place on October 1, 2010, the parties executed several amendments setting a series of new closing dates, all of

---

[1] The second page of the Temporary Certificate of Occupancy noted, "Need to replace and complete installation of A label doors in 3 hour fire barrier," and a notice at the bottom of the certificate stated that "issuance of the certificate of occupancy does not guarantee that all provisions of the Uniform Statewide Building [C]ode have been met." 2 J.A. at 681-82. The language of the certificate itself demonstrates that the Temporary Certificate of Occupancy was not "final" as required by the conditions precedent to closing. *Id.* at 662.

which failed due to unmet conditions precedent to closing. The final amendment, the "Fourth Amendment to Purchase and Sale Agreement," provided that the closing would occur on October 21, 2011. *Id.* at 720-21. Several conditions precedent to closing still were not satisfied on October 21, 2011, and the sale did not close.

Because the March 31, 2011 closing date established by the short-sale agreement had long since passed, the Lender gave notice of its intent to foreclose and set the foreclosure sale for January 19, 2012. The Seller and the Buyer scrambled to find a way to conclude a voluntary sale prior to foreclosure. On January 18, 2012, in the late afternoon on the day before the foreclosure, the Buyer's closing attorney forwarded a proposed HUD-1 settlement statement to the Seller and the Lender.[2] The settlement statement claimed that the Buyer had made a $620,527.74 advance to the Seller for construction costs and attributed $541,847.64 to the Seller in order to release mechanic's liens and judgment liens that attached to the property during construction. The settlement statement provided that the Seller would have to bring $922,596.05 to closing for payment of costs in order to close.[3]

---

[2] Both the Seller and the Seller's attorney testified that the county records office had closed prior to receiving the settlement statement from the Buyer's closing attorney at 4:19 p.m. on January 18. *See id.* at 527, 566-67.

[3] This final amount to be brought by the Seller to closing, however, did not include a reduction of $448,000 for the Buyer's exercise of the option to buy the adjacent parcel of land. Both the Buyer and the Seller agreed that the option had been exercised and that the purchase price should have offset the amount that the Seller had to bring to closing. *See id.* at 386, 478. The Buyer's closing attorney also noted in his email containing the initial draft settlement statement that "a separate settlement statement" would be prepared showing the payment of $448,000 for the option parcel. *Id.* at 683. The Buyer's attorney stated that the $448,000 "will be applied to the amount Seller needs to bring to closing." *Id.* This separate draft settlement statement, however, was never prepared before the foreclosure sale, *see id.* at 423, 482, 509, 570-71, and the promised purchase price of $448,000 for the option parcel was not applied to the settlement statement prior to the foreclosure sale in order to offset the amount that the Seller had to bring in order to close, *see id.* at 399-400. Other adjustments acknowledged by both the Buyer and the Seller late in the day on January 18 also were not made to the draft settlement statement prior to the foreclosure. *See id.* at 727-28.

The Seller contested the figures on the settlement statement, claiming that it included multiple inaccuracies and overstated the charges attributed to the Seller for releasing liens. The Buyer acknowledged some of these inaccuracies in email exchanges with the Seller the evening before the foreclosure but failed to provide a revised settlement statement prior to the foreclosure sale. *See id.* at 399-400, 509, 683, 727-28; *see also supra* note 3. In an effort to reduce its net payout so that the sale could still close, the Seller nonetheless attempted to persuade the Lender to accept even less payment on the debt owed than the Lender had agreed to accept in the earlier short-sale agreement. The Lender refused to do so. Thus, the last attempt at a voluntary sale failed, and the Lender sold the property at a foreclosure sale on January 19. The Lender purchased the property at the foreclosure sale and later sold it to the Buyer.

Seeking a sales commission, the Broker sued the Buyer and alleged that they had an oral brokerage agreement between them. *See* 2 J.A. at 473. The trial court dismissed the suit because the alleged agreement violated the statute of frauds. *See id.* The Broker thereafter brought the present suit against the Seller to obtain a sales commission based upon the theory that the Seller improperly prevented the sale from closing and that, as a result, the Seller violated the Broker's contractual right to a sales commission through the Broker's capacity as a third-party beneficiary under the sale agreement.

In its complaint against the Seller, the Broker alleged that the sale did not close for only one reason: The Seller was "unable to bring sufficient funds to closing to honor its obligation under the [sale agreement] to provide title free from all encumbrances to the purchasers." 1 *id.* at 4. The Seller filed a demurrer alleging that "[n]o brokerage fee is due because no closing occurred," and thus, the Broker "is estopped . . . by the plain language in the [sale agreement]." R. at 36. The Broker responded that "the closing of the sale failed because [the Seller] was

4

unable to bring sufficient funds to closing to clear the monetary liens and encumbrances," and thus, "[t]he prevention doctrine is applicable to this case because the Agreement provides as a condition that the real estate commission is payable only if closing occurs." *Id.* at 48-49. The trial court denied the Seller's demurrer. *Id.* at 54-55.[4] Following a bench trial, the trial court ruled in favor of the Broker and awarded the sales commission.

## II.

On appeal, the Seller asserts several assignments of error clustered around three challenges to the trial court's ruling: (i) the Broker did not qualify as a third-party beneficiary to the sale agreement; (ii) the sale agreement terminated of its own accord because closing did not occur on the closing dates agreed upon because "time was of the essence"; and (iii) even if the Broker was a third-party beneficiary and the parties had waived the time-is-of-the-essence provision, the Seller did not prevent the closing in violation of the "prevention doctrine" as a matter of law. *See* Appellant's Br. at 10-11.[5]

Agreeing with this last assertion, we need not address the first two. *See Commonwealth v. White*, 293 Va. 411, 419, 799 S.E.2d 494, 498 (2017) (recognizing that "the doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available'" (alteration and citation omitted)); *see also Shareholder Representative Servs. v. Airbus Americas, Inc.*, 292 Va. 682, 689, 791 S.E.2d 724, 727 (2016) (concluding that a dispositive assignment of error obviates any need to address other assignments of error).

---

[4] While the trial court's order alludes to a November 20, 2015 demurrer hearing, no transcript of that hearing appears in the record.

[5] Assignment of Error 5 challenges the trial court's decision to grant the Broker's motion in limine seeking to exclude evidence of the alleged brokerage agreement between the Broker and the Buyer. Given our holding, we need not address this issue.

## A. THIRD-PARTY BENEFICIARY

Before addressing the prevention doctrine, we must first frame the Broker's claimed status as a third-party beneficiary. Relying on Code § 55-22, the Broker argues that the provision in the sale agreement, which obligated the Seller to pay the sales commission "if and only if closing occurs," 2 J.A. at 663, vested in the Broker an independent contractual right of action even though the agreement did not identify the Broker as a party to the agreement and the Broker did not sign it. *See generally Thorsen v. Richmond SPCA*, 292 Va. 257, 273, 786 S.E.2d 453, 462 (2016) (allowing a nonparty to sue on a contract if it was a "clearly and definitely intended beneficiary" (citation omitted)).[6]

The Seller asserts that any arguable claim to third-party beneficiary status was limited under the express terms of the written agreement to one scenario: recovery of a sales commission "if and only if closing occurs." 2 J.A. at 663. Because closing never occurred, the Seller concludes, the Broker has no contractual right of action because third-party beneficiary status exists only when the "party sought to be held liable has assumed an obligation for the benefit of a third party." *Professional Realty Corp. v. Bender*, 216 Va. 737, 740, 222 S.E.2d 810, 812 (1976) (quoting *Burton v. Chesapeake Box & Lumber Corp.*, 190 Va. 755, 767, 57 S.E.2d 904, 909 (1950)); *see also MNC Credit Corp. v. Sickels*, 255 Va. 314, 320, 497 S.E.2d 331, 335 (1998); *Valley Landscape Co. v. Rolland*, 218 Va. 257, 260, 237 S.E.2d 120, 122

---

[6] Code § 55-22 (and its predecessor statutes) superseded the "general rule at common law . . . that an action on a contract must be brought in the name of the party in whom the legal interest is vested, and this legal interest [was] ordinarily vested only in the promisee or promisor," and as a result, "they or their privies are generally the only persons who can sue on the contract." 1 Charles E. Friend & Kent Sinclair, Friend's Virginia Pleading and Practice § 5.07[1], at 5-20 to -21 (2d ed. 2007) (citation omitted). *See generally Horney v. Mason*, 184 Va. 253, 257-58, 35 S.E.2d 78, 80 (1945) (discussing statutory revisions that superseded the traditional common-law rule).

(1977).  In short, the Seller contends, the only obligation it assumed toward the Broker was the obligation to pay a commission "if and only if closing occur[ed]," Appellant's Br. at 5 (alteration in original) (quoting 2 J.A. at 663), and nothing in the agreement suggests that the Seller assumed an obligation *to actually close* for the benefit of the Broker.

We need not decide this nuanced contest because, for purposes of our analysis, we assume without deciding that the Broker has sufficient third-party beneficiary status to assert a contractual right.  Our assumption is nonetheless important, however, because Code § 55-22 provides that "the covenantor or promisor shall be permitted to make all defenses he may have, not only against the covenantee or promisee, but against such beneficiary as well."  In this context, the "promisor" is the party that "made the promise that a third party seeks to enforce." Joseph M. Perillo, Contracts § 17.1, at 612 (7th ed. 2014).  The promisee is the party to the contract receiving the promisor's promise to benefit the third-party beneficiary.  *See id.*

Applying Code § 55-22 and its predecessor statutes, we have long recognized that, "[o]f course, if the beneficial owner is allowed to sue, the promisor or covenantor should be allowed all defenses against him." *Horney v. Mason*, 184 Va. 253, 258, 35 S.E.2d 78, 80 (1945).  The third-party beneficiary, therefore, "is subject to defenses arising from" the agreement.  *First Sec. Fed. Sav. Bank v. McQuilken*, 253 Va. 110, 114, 480 S.E.2d 485, 488 (1997); *see also Levine v. Selective Ins. Co. of Am.*, 250 Va. 282, 286-87, 462 S.E.2d 81, 84 (1995).

In practical terms, a third-party beneficiary's claim fails if the promisor could defeat the same claim if the promisee had asserted it directly against him.  This general rule exists "[b]ecause the rights of third parties are derivative," and as a result, "defenses and limitations created [by the agreement] are effective against beneficiaries as well."  Perillo, *supra*, § 17.3, at 614.  While the "rights of the beneficiary stem from the contract between the promisor and the

7

promisee," the derivative nature of a third-party beneficiary's rights implies that these rights can sink lower than but cannot rise higher than those of the promisee unless the agreement specifically provides otherwise. *Id.* § 17.10, at 630.

## B. THE PREVENTION DOCTRINE

The trial court held that the Seller prevented the sale from closing and, by doing so, breached its obligation to pay the promised sales commission in the sale agreement. On appeal, the Seller contends that the trial court misapplied the prevention doctrine, and if the prevention doctrine had been properly applied, the Seller could not have been liable for the sales commission. We agree.

The Seller's obligation to pay the Broker a sales commission was subject to its own condition precedent: The Seller agreed to pay the sales commission "if and only if closing occurs." 2 J.A. at 662. Under traditional principles of contract law,

> (1) Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.
> (2) Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.
> (3) Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.

Restatement (Second) of Contracts § 225 (1981); *see also* 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.3, at 421-23 (3d ed. 2004).

As a general rule, therefore, "[a] term that makes an event a condition of one party's duty does not *of itself* impose a duty on the other party that the event occur, and the nonoccurrence of a condition is therefore not of itself a breach of contract by that other party." 2 Farnsworth, *supra*, § 8.3, at 427 n.22 (emphasis added); *see, e.g.*, *United States v. O'Brien*, 220 U.S. 321, 327-28 (1911) (finding that a contractor's right to continue to dredge in order to perform a

8

contract was conditional on the government engineer's satisfaction with their work but ultimately the failure to satisfy the engineer did not breach the contract).

Intersecting with these general principles is the so-called prevention doctrine, a rather loose cluster of ideas that serves "both positive and negative functions." 10 John E. Murray, Jr., Corbin on Contracts § 53.5, at 38 (Joseph Perillo ed., rev. ed. 2014). The prevention doctrine is the well-recognized "principle of contract law that if one party to a contract hinders, prevents or makes impossible performance by the other party, the latter's failure to perform will be excused." 13 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 39:3, at 569 (4th ed. 2013).

Used as a defense, the doctrine precludes the "preventing party" from recovering "damages for the resulting nonperformance" by the party prevented or from "otherwise benefit[ing] from its own wrongful acts." *Id.* § 39:3, at 571; *see also Boggs v. Duncan*, 202 Va. 877, 882, 121 S.E.2d 359, 362-63 (1961) (concluding "that the plaintiffs prevented the performance of the contract" and that "it necessarily follows that they are not entitled to recover damages of the defendant for nonperformance"); 10 Corbin on Contracts, *supra*, § 53.5, at 41 ("To one who is sued for nonperformance of a promise it is a defense if he can prove that the performance was prevented or substantially hindered by the plaintiff.").

The doctrine has an offensive use as well. "When a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to its promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform and may not legally terminate the contract for nonperformance." 13 Williston & Lord, *supra*, § 39:3, at 571-73. In this offensive use of the prevention doctrine, the prevention involves an active, wrongful effort or omission by the promisor for the purpose of thwarting the condition from

9

being satisfied and allows the promisee to recover damages for the promisor's failure to perform the contract.

To protect the conceptual boundaries of the prevention doctrine from becoming hopelessly indistinct, Virginia law has emphasized that the acts or omissions constituting the alleged prevention of the condition "must be wrongful, and, accordingly, in excess of [the promisor's] legal rights." *Whitt v. Godwin*, 205 Va. 797, 800-01, 139 S.E.2d 841, 844 (1965) (quoting 5 William Herbert Page, The Law of Contracts § 2919, at 5145 (2d rev. ed. 1921)). Otherwise, the mere inability of the promisor to satisfy a condition precedent to his contractual duties would transform the condition into a warranty because it would convert a promisor's innocent inability or legal incapability to satisfy the condition (typically permitting the contract to terminate without liability on either party) into a breach resulting in absolute liability on the promisor (effectively imposing liability upon him *despite* the failure of conditions precedent to his performance).

We thus consider it "manifest that this principle has no application when the hindrance is due to some action of the promisor which he was permitted to take under either the express or implied terms of the contract." *Id.* at 800, 139 S.E.2d at 844. The First Restatement of Contracts, which we relied upon in *Whitt*, captured this idea well by explaining that the prevention doctrine does not apply when "the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party." 1 Restatement of Contracts § 295(b), at 438 (1932). Our precedent thus fits squarely with the "weight of authority," which holds that while "specific malevolent intent" need not be shown when the doctrine is applied defensively, "the preventing party must have deliberately taken steps to impede performance or

10

have arbitrarily impaired the other party's ability to perform." 13 Williston & Lord, *supra*, § 39:10, at 597; *see also* 10 Corbin on Contracts, *supra*, § 53.5, at 40.[7]

We addressed the offensive use of the prevention doctrine in *Parrish v. Wightman*, 184 Va. 86, 91-93, 34 S.E.2d 229, 232 (1945). In that case, a seller entered into a sale agreement with a buyer that stated the seller would pay the broker's commission "when and if" the buyer paid the total purchase price and the deed was conveyed. *Parrish*, 184 Va. at 88, 34 S.E.2d at 230. Before the buyer made the second installment on the purchase price, the seller agreed to sell the property to a new buyer for a higher price and an earlier due date for the total purchase amount. *See id.* The original buyer sold and assigned its contract interest to the new buyer, and the seller released the original buyer from any liability. *See id.* As a result, the seller and the new buyer entered into a new sale agreement that did not include any provision for payment of a broker's commission. *See id.*

We held that the seller "actively engaged in a course of conduct" that purposefully prevented the first sale from closing by releasing the original buyer from the contract and entering into a new sale agreement with the original buyer's assignee at a significantly higher price due on an earlier date. *Id.* at 92, 34 S.E.2d at 232. This conduct fell squarely within the scope of the prevention doctrine, which we found to be "clearly stated in *Amies v. Wesnofske,* [174 N.E. 436 (N.Y. 1931)]." *Id.* Under this standard, the prevention doctrine applies when a promisor is at "fault" and "is the cause of the failure of performance of a condition upon which

---

[7] Some courts and commentators contend that "[w]hat has become known as the 'prevention doctrine' is subsumed under the generic standard of good faith and fair dealing found in the Restatement (Second) of Contracts." 10 Corbin on Contracts, *supra*, § 53.5, at 38. Under this formulation, "[s]pecific factual allegations of a party's bad faith acts are required" to implicate the prevention doctrine. *Id.* § 53.5, at 40. Though we have not used this conceptual basis for our application of the doctrine, the result is often the same under the wrongful-conduct standard articulated in *Whitt*, 205 Va. at 800-01, 139 S.E.2d at 844.

11

his own liability depends" because "[i]t is a well settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself." *Id.* (quoting *Amies*, 174 N.E. at 438). An important caveat exists for this rule, however:

> No such [prevention] doctrine can be efficacious to compel positive action by the promisor to bring about the performance of the condition. For that result the implication of a promise would be requisite. . . . On principle, then, the duty of a vendor to his broker is fulfilled if he remain passive and neutral; the condition, upon which the payment of commissions is made to depend, is waived only where the vendor is active to prevent or hinder its performance. The principle has been applied in many jurisdictions.

*Amies*, 174 N.E. at 438.

A mere condition precedent is not the same thing as an affirmative contractual promise or duty. A "condition" is "[a] future and uncertain event on which the existence or extent of an obligation or liability depends" or "an uncertain act or event that triggers or negates a duty to render a promised performance." Black's Law Dictionary 354 (10th ed. 2014). On the other hand, a "duty" is defined as "[a] legal obligation that is owed or due to another and that needs to be satisfied" or "that which one is bound to do, and for which somebody else has a corresponding right." *Id.* at 615. A promisor may be liable, with or without fault, for a breach of a contractual duty. A mere condition, however, has a presumptively opposite effect.[8] Its nonoccurrence, standing alone, typically excuses the promisor of any liability.[9]

---

[8] The "most common reason" for a promisor to qualify a duty on the occurrence of a condition "is to shift to the [promisee] the risk of nonoccurrence of the event." 2 Farnsworth, *supra*, § 8.2, at 417.

[9] Pursuant to the sale agreement, if any of the conditions precedent were unsatisfied by the closing date, "either party" could terminate the agreement through "written notice to the other party," and "neither Seller nor Purchaser shall have any liability hereunder except for any obligations which expressly survive the termination of this Agreement." 2 J.A. at 662. While such written notice is necessary to terminate the sale agreement for unmet conditions precedent, whether either party provided such written notice is irrelevant to determine whether a condition

12

Even when the prevention doctrine rebuts that presumption, liability falls upon the promisor subject to the threshold, but-for causation requirement. As the First Restatement of Contracts explained, the doctrine is applicable when the condition would have occurred "except for such prevention or hindrance" of the promisor. 1 Restatement of Contracts § 295, at 438. We restated this view in *Parrish*: "If a promisor prevents or hinders the occurrence of a condition . . . and the *condition would have occurred . . . except for such prevention or hindrance*, the condition is excused, and . . . does not discharge the promisor's duty." 184 Va. at 92-93, 34 S.E.2d at 232 (emphasis added) (citation omitted).

This but-for causation requirement for the prevention doctrine tracks basic breach-of-contract principles in Virginia. As we recognized in *Boggs*, "prevention is a breach of the contract by the party so preventing performance and renders him liable to pay damages." 202 Va. at 882, 121 S.E.2d at 363. A party "who violates his contract with another should generally be held responsible for all direct and proximate damages which result from such violation," but damages that "are so remote as not to be directly traceable to that breach, *or are attributable to some other intervening cause*, . . . cannot be allowed." *Haass & Broyles Excavators, Inc. v. Ramey Bros. Excavating*, 233 Va. 231, 235-36, 355 S.E.2d 312, 315 (1987) (quoting *Manss-Owens Co. v. H.S. Owens & Son*, 129 Va. 183, 202, 105 S.E. 543, 549 (1921)).

Because recovery of damages for a breach of contract requires causation, it thus follows that recovery of damages for the prevention of the performance of a condition, which is akin to a breach of contract, would also require causation. *See, e.g.*, *R.G. Pope Constr. Co. v. Guard Rail of Roanoke, Inc.*, 219 Va. 111, 118, 244 S.E.2d 774, 778-79 (1978) (finding that the plaintiffs

---

precedent is merely a condition upon which the existence of a duty depends or a contractual duty for which the promisor is absolutely liable.

"unjustifiably prevented" the defendant from performance of the contract "*by conduct which caused the delay* in completion of the project" and holding that the plaintiffs were liable to the defendant for damages (emphasis added) (citing *Boggs*, 202 Va. at 882, 121 S.E.2d at 363)).[10]

## C.  THE INAPPLICABILITY OF THE PREVENTION DOCTRINE

In this case, the fourth and last amendment to the sale agreement required the closing to take place on October 21, 2011.  Like all the earlier closing dates, that closing date failed because of several unmet conditions precedent to closing.  By that time, the Lender's deadline for closing the short sale (March 31, 2011) had long since passed.  The Lender could have expressly waived the closing deadline in the short-sale agreement or accepted an amendment extending that deadline.  The Lender never did so, however.

When the Lender initiated the foreclosure process, the Seller and the Buyer began yet another round of negotiations attempting to close the sale.  These negotiations proved to be unsuccessful for several reasons. The Buyer's proposed HUD-1 settlement statement claimed a $620,527.74 advance by the Buyer to the Seller for construction costs.  The Seller reasonably disputed that amount by alleging that the Buyer had agreed to advance up to $750,000 for incurred construction costs, many of which resulted in the numerous liens attached to the property.  *See id.* at 515-16, 720.  The settlement statement attributed $541,847.64 to the Seller in order to release mechanic's liens and judgment liens that attached to the property after the

---

[10] The Second Restatement of Contracts softens the causation principle by requiring only an initial showing that the prevention or hindrance "contributed materially to the non-occurrence" of the condition.  Restatement (Second) of Contracts § 245 cmt. b.  Thereafter, "if it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule does not apply.  The burden of showing this is properly thrown on the party in breach."  *Id.*  We reject this proposed modification of the governing burden of proof and reaffirm that, as generally true in all contract claims, the burden of proving causation is properly placed on the party claiming the breach.

execution of the sale agreement. The Seller, however, reasonably disputed this figure and challenged the Buyer's attribution of various liens to the Seller. *See id.* at 521-24, 685-87. The settlement statement ultimately provided that the Seller would be required to bring $922,596.05 to closing for payment of these costs in order to convey fee simple marketable title — a hotly disputed aggregate figure that did not even include a reduction of $448,000 for the purchase price of the option parcel, *see supra* note 3.[11]

From the beginning of this case, the Broker has focused its prevention argument on a single allegation: The Seller was "unable to bring sufficient funds to closing to honor its obligation under the [sale agreement] to provide title free from all encumbrances to the purchasers." 1 J.A. at 4 (Complaint ¶ 11). On appeal, the Broker maintains this focus by contending that the Seller "was in default on its construction loans" and could not comply with its "short sale" agreement with the Lender, and thus, the Seller "was unable to bring sufficient cash to closing to clear the encumbrances on the property." Appellee's Br. at 24-25. From the Broker's perspective, the closing failed because of the Seller's financial inability to work out a final deal that accommodated the Lender, the contractors who had filed liens, and the Buyer, with whom the Seller had an ongoing dispute over the proper accounting of cash advances for construction costs and their respective responsibilities to pay off certain liens.

We hold that the Broker's allegations and the evidence offered to support them do not satisfy the requirements of the prevention doctrine as a matter of law. The Buyer's proposed settlement statement — delivered on the eve of foreclosure — directed the Seller to bring to

---

[11] To make matters worse, at least one express condition precedent to closing in the sale agreement remained unmet — obtaining a final Certificate of Occupancy. *Compare* 2 J.A. at 662 (requiring that the "Seller or Purchaser shall have obtained a final Certificate of Occupancy from Chesterfield County" prior to closing), *with id.* at 681-82 ("Temporary Certificate of Occupancy").

closing an amount of money that the Seller either did not have, could not obtain, or was legally within its rights to challenge as excessive.[12] Viewed through the lens of the *Whitt* standard, these circumstances do not show a purposeful act or omission that "wrongfully prevented" the if-and-only-if condition of closing from being satisfied. *See Whitt*, 205 Va. at 801-02, 139 S.E.2d at 844-45. Thus, "the issue presented [becomes] one of law" for the court, not one of factual sufficiency for the factfinder. *Id.*; *see also* 5 Page, *supra*, § 2919, at 5145.

## III.

In sum, the trial court erred as a matter of law by awarding the Broker a sales commission on the ground that the Seller wrongfully prevented the closing. We thus reverse the judgment of the circuit court and enter final judgment for the Seller.

*Reversed and final judgment.*

---

[12] *See* 12 U.S.C. § 3500.8(b) (requiring a settlement agent using a HUD-1 settlement statement to "state the actual charges paid by the borrower and seller on the HUD-1" and "separately itemize each third party charge paid by the borrower and seller"); *see also* Code § 55-525.24 (listing a "settlement statement or closing disclosure that has been signed by the seller and the purchaser or borrower" as a condition for disbursing escrow funds held by the settlement agent in real estate transactions).